1  William A. Nebeker, Esq., AZ State Bar No. 004919
   Rosary A. Hernandez, Esq., AZ State Bar No. 020182
2  Gregory E. Williams, Esq., AZ State Bar No. 020320
   Valerie R. Edwards, Esq., AZ State Bar No. 017217
3  Lisa I. Streu, Esq., AZ State Bar No. 026679
   **KOELLER NEBEKER CARLSON & HALUCK, LLP**
4  3200 North Central Avenue, Suite 2300
   Phoenix, Arizona 85012-2443
5  Telephone:  (602) 256-0000
   Facsimile:  (602) 256-2488
6  *Attorneys for the Plaintiffs*

7                    **UNITED STATES DISTRICT COURT**

8                        **DISTRICT OF ARIZONA**

9

10  JONATHAN E. ROBINSON, a single man;      **Case No.:  4:2009cv00227**
    and SALLY J. ROBINSON-BURKE, a
11  married woman; ROSA A. SILVAS, a single
    woman; AMANDA HOLBERT, a single         **FIRST AMENDED CLASS ACTION**
12  woman; individually and on behalf of a class          **COMPLAINT**
    of similarly situated individuals,
13
                                            1. **Violation of Truth in Lending Act, 15**
14           Plaintiffs,                        **U.S.C. § 1601,** *et seq.*
                                            2. **Violation of Real Estate Settlement**
15  vs.                                         **Procedures Act, 12 U.S.C. § 2601,** *et*
                                                *seq.*
16  GE MONEY BANK, a foreign corporation;   3. **Violation of Home Ownership and**
    WMC MORTGAGE CORP., a California            **Equity Protection Act, 15 U.S.C. §§**
17  corporation; WELLS FARGO BANK, N.A.,        **1602(aa), 1610, and 1639**
    a California corporation, dba WELLS      4. **Violation of the Fair Housing Act, 42**
18  FARGO HOME EQUITY and dba WELLS             **U.S.C. § 3601,** *et seq.*
    FARGO HOME MORTGAGE, a division of      5. **Violation of Fair Debt Collection**
19  WELLS FARGO BANK, N.A., a California        **Practices Act, 15 U.S.C. § 1692, et**
    corporation; AMERICA'S SERVICING           **seq.**
20  COMPANY, a foreign corporation and      6. **Violation of Arizona Consumer**
    division of WELLS FARGO BANK, N.A., a       **Fraud Act, A.R.S. § 44-1522, et. seq.**
21  California corporation; COUNTRYWIDE     7. **Conspiracy to Commit Fraud and**
    HOME LOANS, INC., a New York                **Conversion**
22  corporation; AMERICA'S WHOLESALE       8. **Conspiracy to Commit Fraud Related**
    LENDER, a division or subsidiary of         **to MERS System**
23  COUNTRYWIDE HOME LOANS, INC., a        9. **Intentional Infliction of Emotional**
    New York corporation; MERSCORP, INC.,       **Distress**
24  a Virginia corporation; MORTGAGE       10. **Injunctive Relief**
    ELECTRONIC REGISTRATION
25

                                  - 1 -

SYSTEMS, INC., a subsidiary of
MERSCORP, Inc., a Delaware corporation;
FEDERAL HOME LOAN MORTGAGE
CORPORATION, a Virginia corporation;
FEDERAL NATIONAL MORTGAGE
ASSOCIATION, a District of Columbia
corporation; GMAC MORTGAGE, L.L.C., a
Delaware corporation; NATIONAL CITY
MORTGAGE, a foreign company and a
division of NATIONAL CITY BANK, a
foreign company; J.P. MORGAN CHASE
BANK, N.A., a New York corporation;
CITIMORTGAGE, INC., a New York
corporation; HSBC MORTGAGE
CORPORATION, U.S.A., a Delaware
corporation; AIG UNITED GUARANTY
CORPORATION, a foreign corporation;
BANK OF AMERICA, N.A., a Delaware
corporation; and FIRST AMERICAN TITLE
INSURANCE CORPORATION, a
California corporation;

        Defendants.

**11. Declaratory Relief**

Plaintiffs, individually, and on behalf of a class of similarly situated individuals, through undersigned counsel, for Plaintiffs' complaint against Defendants, allege as follows:

## JURISDICTION

1.     Jurisdiction is founded upon 28 U.S.C. § 1331, as this matter presents issues of federal law, and this court has jurisdiction over the subject matter of this action pursuant to the laws of the United States, including, but not limited to, 15 U.S.C. § 1601, *et seq.;* 12 U.S.C. § 2614, *et seq.;* 15 U.S.C. § 1692 and 15 U.S.C.§ 1640.

2.      This court also has jurisdiction pursuant to 28 U.S.C. § 1332 based on diversity of citizenship, as Plaintiffs are Arizona residents, Defendant WMC Mortgage Corporation (hereinafter referred to as "WMC Mortgage Corp.") is a California corporation and a division or subsidiary of GE Money Bank; Defendant GE Money Bank (hereinafter "GE Money") is a Delaware corporation; Defendant Wells Fargo Bank, N.A. dba Wells Fargo Home Equity, Wells Fargo Home Mortgage, a division of Wells Fargo Bank, N.A., (hereinafter collectively referred to as "Wells Fargo") is a California corporation; Defendant America's Servicing Company is based in Iowa and is a Wells Fargo entity operating under a fictitious name based in Iowa; Defendant Countrywide Home Loans, Inc. ("Countrywide"), is a New York corporation; Defendant America's Wholesale Lender is a New York corporation, Defendant MERSCORP, Inc. is a Delaware corporation; Defendant Mortgage Electronic Registration Systems, Inc. (hereinafter "MERS, Inc.") is a Delaware corporation and a wholly-owned subsidiary of Defendant MERSCORP, Inc.; and Defendants Federal Home Loan Mortgage Corporation, Federal National Mortgage Association, GMAC Mortgage, L.L.C., National City Mortgage, J.P. Morgan Chase Bank, N.A., CitiMortgage, Inc., HSBC Mortgage Corporation, U.S.A., AIG United Guaranty Corporation, and First American Title Insurance Corporation, are foreign corporations, and because this matter is a class action with claims having a value in excess of $5,000,000.00.

3.      This court has pendent jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

4.      Venue over this matter is appropriate in this court pursuant to 28 U.S.C. § 1391(b).  The acts complained of occurred, in substantial part, in the State of Arizona, the

property subject to this action is situated in Arizona, the owners of the property reside in Arizona, and at all relevant times material hereto, the Defendants are or were doing business in Arizona.

### PARTIES AND STANDING

5.     Plaintiff Jonathan Edward Robinson, formerly Jonathan Edward Hernandez, pursuant to an official name change dated September 25, 2008, is a resident of Pima County, Arizona.

6.     Plaintiff Sally Jane Robinson-Burke, formerly Sally Jane Hernandez, pursuant to an official name change dated September 25, 2008, is a resident of Pima County, Arizona and is the natural mother of Plaintiff Jonathan Robinson. (Plaintiffs Sally Robinson Burke and Jonathan Robison will be collectively referred to herein as "Robinson").

7.     At all times relevant and material hereto, Plaintiffs Robinson maintained their primary residence in Pima County, Arizona located at 7095 North Tula Lane, Tucson, Arizona 85743 (hereinafter referred to as the "Robinson Residence").

8.     Plaintiff Rosa Silvas (referred to herein as "Silvas") is a resident of Santa Cruz County, Arizona.

9.     At all times relevant and material hereto, Plaintiff Silvas maintained her primary residence in Santa Cruz County, Arizona located at 3167 N. Corona Place, Nogales, Arizona 85621 (hereinafter referred to as the "Silvas Residence").

10.     Plaintiff Amanda Holbert (referred to herein as "Holbert") is a resident of Pima County, Arizona.

- 4 -

11.   At all times relevant and material hereto, Plaintiff Holbert maintained her primary residence in Pima County, Arizona located at 10636 South Varner Drive, Vail, Arizona 85641 (hereinafter referred to as the "Holbert Residence").

12.   Upon information and belief, Defendant WMC Mortgage Corp. was a California corporation and is a division or subsidiary of GE Money, a foreign corporation who is authorized to do business in, and doing business in, Arizona.

13.   Upon information and belief, Defendant GE Money is a Delaware corporation authorized to do business in, and doing business in, Arizona and is or was a member of the MERS system described herein.

14.   Upon information and belief, Defendant Wells Fargo is a California corporation authorized to do business in, and doing business in, Arizona and is or was a member of the MERS system described herein.

15.   Upon information and belief, America's Servicing Company is a Wells Fargo entity based in Iowa and operating under a fictitious name. America's Servicing Company was authorized to do, and doing business in, Arizona and is or was a member of the MERS system described herein.

16.   Upon information and belief, Defendant Countrywide Home Loans, Inc. ("Countrywide") is a New York corporation authorized to do business in, and doing business in, Arizona and is or was a member of the MERS system described herein.

17.   Upon information and belief, Defendant America's Wholesale Lender is a New York corporation and is a division or subsidiary of Countrywide, a New York

corporation authorized to do business in, and doing business in, Arizona and is or was a member of the MERS system described herein.

18.     Upon information and belief, Defendant MERSCORP, Inc. is a Delaware corporation doing business in Arizona through its subsidiary, Defendant MERS, Inc., a Delaware corporation.  Upon information and belief, MERSCORP, Inc. was a director of MERS, Inc.  Defendants MERSCORP, INC. and MERS, Inc. are hereinafter collectively referred to as "MERS."

19.     Upon information and belief, Defendant Federal Home Loan Mortgage Corporation (hereinafter referred to as "Freddie Mac") is a Virginia corporation doing business in Arizona, and a shareholder in MERSCORP, Inc.  Upon information and belief, Freddie Mac was also, through its agents and employees, a director of MERSCORP, Inc. and/or MERS, Inc.

20.     Upon information and belief, Defendant Federal National Mortgage Association (hereinafter referred to as "Fannie Mae") is a District of Columbia corporation doing business in Arizona and, at all times material hereto, was a shareholder of MERSCORP, Inc. and a member of the MERS system described herein.   Upon information and belief, Defendant Fannie Mae was also, through its agents and employees a director of MERSCORP, Inc. and/or MERS, Inc.

21.     Upon information and belief, Defendant GMAC Mortgage, L.L.C. was a Delaware corporation doing business in Arizona and, at all times material hereto, was a member of the MERS system described herein.   Upon information and belief, Defendant GMAC Mortgage, L.L.C., through its affiliate or subsidiary, GMAC Residential Funding

Corp., was a shareholder in MERSCORP, Inc., and through its employees or agents employed by its affiliate or subsidiary, GMAC Residential Holding Corp., was a director of MERSCORP, Inc. and/or MERS, Inc.

22.     Upon information and belief, Defendant National City Mortgage, a division of National City Bank, was a foreign company doing business in Arizona, and at all times material hereto was a member of the MERS system described herein.  Upon information and belief, Defendant National City Mortgage has, through its agents and employees, a chartered seat on the MERSCORP, Inc. and/or MERS, Inc. board of directors.

23.     Upon information and belief, Defendant J.P. Morgan Chase Bank, N.A. was a New York corporation doing business in Arizona and, at all times material hereto, was a member in the MERS system described herein.  Upon information and belief, J.P. Morgan Chase Bank, N.A., through its affiliate or subsidiary, Chase Home Mortgage Corporation of the Southeast, was a shareholder in MERSCORP, Inc., and through its employees or agents employed by its affiliate, J.P. Morgan Chase Co., was a director of MERSCORP, Inc. and/or MERS, Inc.

24.     Upon information and belief, Defendant CitiMortgage, Inc. was a New York corporation doing business in Arizona and, at all times material hereto, was a member in the MERS system described herein and a principal shareholder of MERSCORP, Inc.

25.     Upon information and belief, Defendant HSBC Mortgage Corporation, U.S.A. was a Delaware corporation doing business in Arizona, and at all times material hereto, was a member of the MERS system described herein.  Upon information and belief,

HSBC Mortgage Corporation, through its affiliate or subsidiary HSBC Finance Corp., was a creator, originator and principal shareholder of MERSCORP, Inc.

26.     Upon information and belief, Defendant AIG United Guaranty Corporation was a foreign corporation doing business in Arizona and, at all times material hereto, was a shareholder of MERSCORP, Inc. and/or a member of the MERS system described herein. Upon information and belief, AIG United Guaranty Residential Insurance Co., through its agents and employees, was a director of MERSCORP, Inc. and/or MERS, Inc.

27.     Upon information and belief, Defendant First American Title Insurance Company was a California corporation doing business in Arizona, and at all times material hereto, was a shareholder of MERSCORP, Inc. and/or a member of the MERS system described herein.

28.     Upon information and belief, Defendant Wells Fargo Bank, N.A. was a California corporation doing business in Arizona as Wells Fargo Home Equity and as Wells Fargo Home Mortgage, a Division of Wells Fargo Bank, N.A., and, at all times material hereto, was a member of the MERS system described herein and a shareholder of MERSCORP, Inc.

29     Upon information and belief, Defendant GE Money Bank was an Ohio corporation doing business in Arizona and was a member of the MERS system described herein.

30.     Upon information and belief, Defendant Countrywide, at all times material hereto was a member of the MERS system described herein and a creator, originator and principal shareholder in MERS, Inc.

31.     Upon information and belief, Defendant Bank of America, N.A. was a Delaware corporation doing business in Arizona, and was a successor in interest to Countrywide Home Loans, Inc. and/or acquired Countrywide Home Loans, Inc. for the purpose of funding and/or managing the ongoing business activities of Countrywide Home Loans, Inc.  Upon information and belief, Defendant Bank of America, N.A., at all times material hereto, was a member of the MERS system described herein.

## GENERAL ALLEGATIONS

### (As to Plaintiffs Robinson)

32.     On or about November 14, 2005, Plaintiff Jonathan Robinson obtained financing for the Robinson Residence by executing a Promissory Note and Deed of Trust with WMC Mortgage Corp., a California-based mortgage unit of GE Money, as the Lender. The Deed of Trust listed MERS, Inc. as an alleged "nominee" for the Lender and Lender's successors and assigns.  MERS, Inc., was also listed as the purported beneficiary under the Deed of Trust.

33.     The loan was in the form of two (2) Promissory Notes totaling $625,000.00, and each secured by a separate Deed of Trust.  The first Promissory Note was in the amount of $500,000.00 (hereinafter "First Note"), and the Second Promissory Note equaled $125,000.00 (hereinafter "Second Note") (hereinafter the First Note and Second Note shall be collectively referred to as the "Notes").  The Defendants represented to Plaintiff Jonathan Robinson that the loan funded one hundred percent (100.0%) of the property's appraised value.

34.     Prior to executing the Promissory Notes and the Deeds of Trust, Plaintiff Jonathan Robinson applied for the loan over the telephone through Andy Dunphy of Ace Mortgage Funding, who, upon information and belief, was acting as the agent of Defendants WMC Mortgage Corp. and/or GE Money.

35.     Plaintiff Jonathan Robinson did not sign the application at the time it was filled out by Mr. Dunphy, nor was he provided a copy of the application to review prior to it being submitted to WMC Mortgage Corp. and/or GE Money for approval.

36.     At the closing of the loan on November 14, 2005, Cathy Kerege of First American Title Company, acting as escrow agent for the parties, represented to Plaintiff Jonathan Robinson that the annual percentage rate on the First and Second Notes would equal 7.60% and 10.20%, respectively.  Furthermore, Ms. Kerege represented that the monthly payments for the First and Second Note would equal to $3,237.36 and $1,115.48, respectively.

37.     Plaintiff Jonathan Robinson was not required to provide any income verification to demonstrate his ability to repay the loan.  Upon information and belief, Plaintiff Jonathan Robison's credit score and the appraisal of the Robinson Residence were the only criteria used by WMC Mortgage Corp. and its affiliates to qualify Plaintiff Jonathan Robinson for the refinance loan that is the subject of this action.

38.     The First Note included an "Adjustable Rate Rider," whereby the initial "teaser" interest rate was set at 1.50% from the Closing Date until December 1, 2007 (hereinafter the "Change Date").  The interest rate would be subject to change on the first Change Date and then on the first day of each successive sixth month period thereafter.

39.     Upon each successive Change Date, the adjusted interest rate was calculated by adding 6.750% to the applicable six-month London Interbank Offered Rate (hereinafter "LIBOR").  Over the term of the loan, the interest rate was limited to a maximum ceiling of 14.10% and a minimum floor of 7.60%.

40.     The First Note contained a prepayment penalty that required six months of advanced interest due at the applicable rate in effect at the time of the prepayment, if a prepayment of principal exceeded twenty percent of the original principal balance of the First Note within the first twenty-four (24) months over the life of the loan.

41.     Plaintiff Jonathan Robinson's initial monthly payment on the First Note was set at $3,237.36 for the first twenty-four (24) months.  Thereafter, that payment was expected to rise to $4,460.86 for six (6) months, then settling at to $4,714.70 where it would remain until maturity on December 1, 2035.   This payment schedule negatively amortized the First Note over the first forty-two (42) months of the life of the loan.

42.     When applying for the loan, Defendants and their agents represented to Plaintiff Jonathan Robinson that he would be able to refinance the Robinson Residence at a low rate before the initial "teaser" rate was set to expire.

43.     Plaintiff Jonathan Robinson was led to believe by the Defendants, their agents, representatives and employees, that he was being placed into a loan which he could afford to repay based on his income.  Defendants and their agents, employees and representatives willfully disregarded Plaintiff Jonathan Robinson's income in determining his qualifications for the loan.

44.     Plaintiffs Jonathan Robinson, Sally Robinson-Burke and her husband, John Robinson, took title to the Robinson Residence under a Deed of Trust in the form of joint tenants with rights of survivorship.

45.     GE Money, through its subsidiary WMC Mortgage Corp., failed to provide each Plaintiff with the disclosures as required by the Truth-in-Lending Act (hereinafter "TILA").

46.     Plaintiff Sally Robinson-Burke was not provided the required number of copies of the Right to Cancel Notice as required by Regulation Z of TILA.

47.     Plaintiff Sally Robinson-Burke and her husband, John Robinson, assisted in making the monthly payments on the Robinson Residence.

48.     Faced with an exorbitant prepayment penalty, Plaintiffs contacted America's Servicing Company, the loan servicer, about modifying the First Note in or around October 30, 2007.

49.     After receiving no communications from America's Servicing Company regarding the status of the loan modification application submitted two months prior, Plaintiffs contacted America's Servicing Company in or around January 2008.  Plaintiffs were informed that because no income verification paperwork was submitted with her application for modification, its approval was delayed.   Thereafter, the Plaintiffs immediately mailed the additional information to America Servicing Company as directed.

50.     On or around February 6, 2008, Plaintiffs received a Notice of Trustee's Sale scheduling the sale of the Residence for May 23, 2008.  Upon receiving the Notice of Trustee Sale, Plaintiffs immediately contacted America's Servicing Company to determine

the status of the loan modification.  America's Servicing Company agent, James Battle, informed Plaintiffs that the loan modification was approved subject to the receipt of additional paperwork from the title company.

51.     In or around March 2008, Plaintiffs had still not received confirmation as to whether or not their loan modification application had been approved.      Thereafter, Plaintiffs contacted Mr. Battle at America's Servicing Company, who again assured Plaintiffs that the modification was underway, but that America's Servicing Company was still waiting to receive all of the necessary paperwork.

52.     In or around April 2008, Plaintiffs received notice that their loan modification application was denied.  Plaintiffs contacted America's Servicing Company, which put Plaintiffs in direct contact with Wells Fargo Bank.      In order to stop the Trustee's Sale from occurring as scheduled, Wells Fargo required that Plaintiffs enter into a Forbearance Agreement to permit additional time for Plaintiffs to gather their assets and bring their loan current.

53.     On or around June 1, 2008, the Plaintiffs sent $3,500.00 to America's Servicing as servicer for Wells Fargo Bank, pursuant to the executed Forbearance Agreement, in order to prevent the Residence being sold at trustee's sale.

54.     In or around June 2008, the purported second lender agreed to subordinate to the modified loan on the First Note.  As a result, the Plaintiffs resubmitted the loan modification application on or about August 1, 2008.

55.     On or about August 5, 2008, America's Servicing Company informed Plaintiffs that the modification on the First Note has been denied.

56.     In approximately October 2008, Plaintiffs promptly exercised their right to rescind the loan within the allowed three-year period as provided by TILA by sending notice to Wells Fargo dba America's Servicing Company.

57.     America's Servicing Company, on behalf of Wells Fargo, denied the demand for rescission, contending that Wells Fargo was merely the loan servicer, not the originator, and therefore had no authority to rescind the loan.

58.     America's Servicing Company, on behalf of Wells Fargo, has currently scheduled a trustee sale of the Residence for May 1, 2009.

## GENERAL ALLEGATIONS

### (As to Plaintiff Silvas)

59.     In 2006, Plaintiff Silvas refinanced the Silvas Residence referred to herein in Santa Cruz County, Arizona, by executing a Note and Deed of Trust in favor of America's Wholesale Lender as Lender, with MERS, Inc. listed as the Beneficiary on the Deed of Trust in the principal amount of $357,300.00.

60.     The Promissory Note into which Plaintiff Silvas entered included an "Adjustable Rate Rider" classified as a "PayOption MTA Arm Rider" whereby the initial interest rate was set at two percent (2%) from the Closing Date, March 8, 2006, until the first Interest Rate Change date, May 1, 2006, when the interest rate would increase to seven percent (7%).  Thereafter the interest rate would be subject to change on the First Change Date and then every month thereafter.

61.     Upon each successive Change Date, the interest rate adjustment was to be calculated by adding 3.10% to the Current Index, which is the "Twelve Month Average" of

the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board. The holder of the Promissory Note would then round the result of this addition to the nearest .125%, which would total the new interest rate until the next Change Date. Over the term of the loan, the interest rate was limited to a ceiling of 9.950% and a minimum floor of 3.10%.

62. On each Change Date, the monthly payment required by Plaintiff Silvas would be calculated as the amount of monthly payment that would be sufficient to repay the unpaid principal owed at the Payment Change Date in full on the maturity date in substantially equal payments at the interest rate in effect the preceding month. If the loan's unpaid principal exceeded one hundred fifteen percent (115%) of the originally borrowed amount, the monthly payment could change more frequently than annually and would not be limited by the 7.10% payment cap.

63. Pursuant to the Federal Truth-In-Lending Disclosure Statement, the original payment was set at $1633.29 per month for the first year, $1732.34 per month the year thereafter, $1838.82 per month the year thereafter, to increase incrementally over the next eight years to $3451.30 per month, which would be the fixed payment sum over the remaining twenty years of the loan.

64. The Annual Percentage Rate (hereinafter "APR") was estimated at 7.948% with the total amount of finance charges estimated at $242,357.68, equaling $585,827.15 to be paid over the life of the loan.

64. The Note was also supplemented by a Prepayment Penalty Addendum, which provided for a prepayment penalty of six months' advanced interest "by which the

total of [the] prepayment(s) during the twelve (12) month period immediately preceding the date of the prepayment exceeds twenty percent (20%)" of the Note's original principle. The interest was to be calculated using the interest rate in effect at the time of prepayment.

65.     Upon information and belief, Plaintiff Silvas and her husband's joint tax return reflect a total income in 2005 of $20,967.00.  Plaintiff Silvas' stated income loan application listed her monthly income as $7,000, which was not known to Plaintiff at the time the application was submitted.

66.     Plaintiff Silvas only speaks Spanish and, upon information and belief, none of the closing documents were translated into Spanish.

67.     Due to the onerous and oppressive terms of the contained in the loan as described above, Plaintiff Silvas was unable to continue making payments, ad Notice of Trustee's Sale was recorded with the Santa Cruz County Recorder on July 23, 2008.  The Trustee's Sale was scheduled for October 27, 2008.  Mortgage Electronic Registration System was listed on the Notice as the Beneficiary to the Deed of Trust.

68.     A "Substitution of Trustee" was also recorded on July 23, 2008, with the Santa Cruz County Recorder, wherein Recontrust Company was appointed as trustee for purposes of effectuating the foreclosure on Plaintiff Silvas' Residence.

69.     On October 20, 2008, a "Cancellation of Notice of Sale" was recorded with the Santa Cruz County Recorder.

70.     Apprised of potential federal violations associated with the origination of her loan, Plaintiff Silvas exercised her right to cancel with the three year allotted period pursuant to TILA by sending Countrywide dba America's Wholesale Lender executed

"Notice of Rescission" forms on October 21, 2008.  Countrywide subsequently denied her rescission.

## **GENERAL ALLEGATIONS**

### **(As to Plaintiff Holbert)**

71.     Plaintiff Holbert executed a Note and Deed of Trust to purchase the Holbert residence in the amount of $231,925.00 dated March 14, 2006, which names HomeAmerican Mortgage Corporation as Lender and MERS, Inc. as the Beneficiary.  The Deed of Trust was recorded with the Pima County Recorder on March 21, 2006.

72.     Although the Deed of Trust names HomeAmerican Mortgage as Lender, all processing, funding, and servicing of the loan has been conducted by Countrywide Home Loans, Inc.

73.     In order to procure the loan, Plaintiff Holbert furnished her 2004 tax return to Countrywide, which lists her adjusted gross income as $40,931.00.  At closing, the amount entered on the loan application as monthly income was $5,932.00, which equals $71,184.00 annually.

74.     According to Plaintiff Holbert's Rate-Lock Agreement outlining the terms of her loan, Plaintiff obtained a conventional fixed rate loan over a thirty (30) year term with an interest rate of 6.875%.  Plaintiff's monthly payment amounted to $1,800.35.

75.     Plaintiff Holbert made her monthly loan payments in full and on time until November 2008, in spite of facing serious financial hardship due to loss of employment and caring for a special-needs infant.  In order to maintain her good standing as a borrower

with Countrywide, she attempted on several occasions to contact Countrywide to discuss options available to lower her monthly loan payment.

76.     In or around November 2008, Plaintiff Holbert was informed by Countrywide that Countrywide was precluded from discussing loan modification options with Plaintiff Holbert unless Plaintiff either missed or tardily submitted her monthly loan payments.   Faced with no apparent alternative, Plaintiff Holbert waited to submit her monthly loan payment until after the fifteen (15) day grace period expired.

77.     Once Plaintiff Holbert's monthly loan payment was ultimately deemed "late," Countrywide offered to enroll Plaintiff in a ninety (90) day "Repayment Plan Agreement."   Countrywide explained to Plaintiff that Fannie Mae, the purported owner of Plaintiff's note, does not extend loan modifications to borrowers who are not in arrears. However, according to Countrywide, the Repayment Plan allows borrowers to remit their monthly payments into an impound account held by Countrywide, and Fannie Mae would not be apprised of such payments.   Therefore, by enrolling in this plan, Countrywide informed Plaintiff that she would not be in arrears with Countrywide, but it would appear to Fannie Mae that the loan is seriously delinquent and Plaintiff needs assistance as the Borrower.   Although Plaintiff Holbert was reluctant to enter into such a plan, Countrywide informed her that aside from withholding monthly payments for ninety (90) days and risk damaging her credit, entering into this agreement would be her only avenue to obtain a loan modification.

78.     In January 2009, desperate to keep her home, Plaintiff Holbert executed the Repayment Plan Agreement, the terms of which included three interest-only monthly

payments of $1,547.22 over the course of February, March, and April.  $274.60 would be applied each month to any arrearages on the loan account, and a payment of $4,468.44 would be due in May.  At the end of the ninety (90) day term, Countrywide informed Plaintiff Holbert that she would be eligible for a loan modification and could submit an application immediately thereafter.

79.     Presently, Plaintiff Holbert's monthly account statements do not reflect any payments to have been made over the ninety day Repayment Plan period.  Rather, the Plaintiff's most recent statement lists her past due amount as $5,401.05.

80.     Following the termination of the Repayment Plan Agreement, Plaintiff Holbert has received little communication from Countrywide regarding the status of her loan modification.  Plaintiff has attempted to contact Countrywide numerous times, only to be informed either that her modification application must be resubmitted because her paperwork was "lost" or that her application is "pending."  Plaintiff has since been making monthly payments in accordance with the original loan agreement for $1,800.35.

81.     As a result of making a late payment in November in order to initiate communication with Countrywide regarding possible loan modification options available to her and entering in the Repayment Plan Agreement, Plaintiff Holbert's credit rating has depreciated significantly.

**FIRST CLAIM FOR RELIEF**
**(Violation of the Truth in Lending Act,**
**15 U.S.C. § 1601, *et seq*. and Regulation Z, 12 C.F.R. § 201, *et. seq*.)**
**(As to Defendants GE Money, WMC Mortgage Corp., Wells Fargo, Countrywide**
**Home Loans, Inc., America's Wholesale Lender, and Bank of America)**

82.     Plaintiffs incorporate each and every paragraph of this Complaint as if fully set out in this claim.

83.     As defined in 15 U.S.C.A. § 1602 and 12 C.F.R. § 226.2, the transaction between Plaintiff Jonathan Robinson and Defendant WMC Mortgage Corp. was a "credit sale."

84.     As defined in 15 U.S.C.A. § 1602 and 12 C.F.R. § 226.2, the transaction between Plaintiff Silvas and Countrywide, through its division or subsidiary America's Wholesale Lender, was a "credit sale."

85.     As defined in 15 U.S.C. § 1602, Plaintiff Jonathan Robinson and Plaintiff Silvas were "consumers," and Defendants WMC Mortgage Corp. and America's Wholesale Lender were "creditors."

86.     Pursuant to 15 U.S.C.A. § 1638(b)(1) and 12 C.F.R. § 226.17, Defendants WMC Mortgage Corp. and Countrywide and its division or subsidiary, America Wholesale Lender, were required to make certain specified disclosures to Plaintiff Jonathan Robinson and Plaintiff Silvas before the consummation of the credit transactions.

87.     Upon information and belief, Defendant WMC Mortgage Corp. violated 15 U.S.C. § 1638 by improperly and/or inadequately disclosing one or more of the following items to Plaintiffs Robinson:

    a.      The annual percentage rate;

    b.      The finance charge;

    c.      The amount financed;

d.      The total number of payments;

e.      The payment schedule;

f.      Whether the loan has a demand feature;

g.      Whether the loan has a variable rate feature, and if so, to make disclosure about the variable rate feature;

h.      Whether the borrower may be entitled to a refund of a portion of the finance charges;

i.      Whether the loan is subject to a prepayment penalty, and if so, to make disclosure about the prepayment penalty terms.

88.     Upon information and belief, Defendants Countrywide and its division or subsidiary, America's Wholesale Lender, violated 15 U.S.C. § 1638 by improperly and/or inadequately disclosing one or more of the following items to Plaintiff Silvas:

a.      The annual percentage rate;

b.      The finance charge;

c.      The amount financed;

d.      The total number of payments;

e.      The payment schedule;

f.      Whether the loan has a demand feature;

g.      Whether the loan has a variable rate feature, and if so, to make disclosure about the variable rate feature;

h.      Whether the borrower may be entitled to a refund of a portion of the finance charges;

i.      Whether the loan is subject to a prepayment penalty, and if so, to make disclosure about the prepayment penalty terms.

89.     Upon information and belief, Defendants WMC Corp. and Countrywide and its division or subsidiary, America's Wholesale Lender, respectively, charged fees to Plaintiff Jonathan Robinson and Plaintiff Silvas, respectively, without being properly disclosed pursuant to 15 U.S.C. § 1605 and Regulation Z of Section 226.4.

90.     Upon information and belief, Defendants WMC Mortgage Corp. and Countrywide and its division or subsidiary, America's Wholesale Lender, respectively, and/or their agent or agents, calculated the annual percentage rate based on improperly calculated and disclosed amounts, related to the loans issued to Plaintiff Jonathan Robinson and Plaintiff Silvas, respectively, in direct violation of 15 U.S.C. § 1601, *et seq.* and Regulation Z Sections 226.18(c), 18(d), and 22.

91.     Pursuant to the Truth in Lending Act, borrowers must be provided with notice of their right to rescind the transaction at the time of closing.

92.     Upon information and belief, Defendant WMC Mortgage Corp., through its agents and affiliates, failed to furnish Plaintiffs Robinson with the proper number of Right to Cancel notices pursuant to 15 U.S.C. § 1635 and 12 C.F.R. § 226.23.

93.     Upon information and belief, Plaintiff Silvas was given different figures of the total amount of the loan, the interest rate, the finance charges, and the annual percentage rates on the final amount of the loan.

94.     As a result of Defendants' violations as set forth herein, Plaintiffs are entitled to damages as set forth below.

95.     Pursuant to 15 U.S.C.A. § 163(b) and 12 C.F.R. § 226.3, Defendants Wells Fargo Bank dba America's Servicing Company and Countrywide and its division or subsidiary, America's Wholesale Lender, wrongfully denied Plaintiffs' rescission of their respective transactions during the three-year allowed time period.

96.     As a result of Defendants' violations as set forth herein, Plaintiffs are entitled to damages as set forth below.

97.     Upon information and belief, Defendant WMC Mortgage Corp. and Countrywide and its division or subsidiary America's Wholesale Lender, through their agents and affiliates, fraudulently misrepresented and concealed the true facts related to the items subject to disclosure to Plaintiff Jonathan Robinson and Plaintiff Silvas, and said Plaintiffs did not discover the Defendants' failure to make such disclosures pursuant to 15 U.S.C. § 1638 until one (1) year within the filing of this Complaint.

98.     Defendant Bank of America, as a successor in interest to Countrywide Home Loans, Inc., is liable for the acts of Countrywide Home Loans as alleged herein.

**SECOND CLAIM FOR RELIEF**
**(Violation of Real Estate Settlement Procedures Act, 12 U.S.C. § 2601, *et seq.*)**
**(As to Defendants GE Money, WMC Mortgage Corp., Wells Fargo, Countrywide Home Loans, Inc., and America's Wholesale Lender)**

99.     Plaintiffs incorporate each and every paragraph of this Complaint as if fully set out in this claim.

100.    Defendant GE Money, through its agent WMC Mortgage Corp., is a "mortgage lender" with deposits or accounts insured by a federal agency and/or a lender

that is regulated by the federal government, and therefore is subject to the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601, *et seq.*

101    Defendant Countrywide through its division or subsidiary, America's Wholesale Lender, is a "mortgage lender" with deposits or accounts insured by a federal agency and/or a lender that is regulated by the federal government, and therefore is subject to the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601, *et seq.*

102.    The loans to Plaintiff Jonathan Robinson and Plaintiff Silvas described herein are a federally related mortgage loans subject to 12 U.S.C. § 2601, *et seq.*

103.    Plaintiffs are consumers and a members of the class of consumers subject to protection under 12 U.S.C. § 2601, *et seq.*

104.    Pursuant to 12 U.S.C. § 2601, *et seq.*, Defendants WMC Mortgage Corp. and Countrywide and/or its division or subsidiary, America's Wholesale Lender, were required to provide Plaintiff Jonathan Robinson and Plaintiff Rosa Silvas with a uniform settlement statement, which must clearly and conspicuously itemize all charges imposed upon the borrower and all charges imposed upon the seller in connection with the closing of the loan.

105.    Pursuant to 12 U.S.C. § 2604, Defendant WMC Mortgage Corp. Countrywide and/or its division or subsidiary, America's Wholesale Lender were also required to provide Plaintiff Jonathan Robinson and Plaintiff Silvas with a special information booklet, which was to contain in "clear and concise language" a description and/or explanation of the following:

  a.    Each cost associated with a real estate settlement;

b.      The uniform settlement form required by RESPA (with a sample copy of the form);

c.      The nature and purpose of escrow accounts used in connection with real estate transactions;

d.      The choices available to residential real estate purchasers when they require necessary services incident to a real estate transaction;

e.      Unfair practices and unreasonable or unnecessary charges that a prospective purchaser should avoid in connection with a real estate settlement.

106.   Pursuant to 12 U.S.C. § 2604, Defendants WMC Mortgage Corp. and Countrywide and/or its division or subsidiary, America's Wholesale Lender were required to include a "good faith estimate of the amount or range of charges" for settlement services with the special information booklet described above.  with the special information booklet described above to Plaintiff Jonathan Robinson and Plaintiff Silvas by delivering them to Plaintiffs or placing them in the mail no more than three business days after Defendants received the loan applications described herein.

107.   Pursuant to 12 U.S.C. § 2604, Defendant WMC Mortgage Corp. and Countrywide and/or its division or subsidiary, America's Wholesale Lender, respectively, were required to provide Plaintiff Jonathan Robinson and Plaintiff Silvas, respectively, a good faith estimate and the special information booklet described above no later than three (3) business days after Defendants received the loan applications described herein.

108.   Defendant WMC Mortgage Corp. and Countrywide and/or its division or subsidiary, America's Wholesale Lender, respectively, were required to inform Plaintiff

Jonathan Robinson and Plaintiff Silvas, respectively, at the time of application, as to whether the servicing of the loan could be assigned, sold, or transferred during the life of the loan.

109.    Defendants WMC Mortgage Corp., America's Servicing Company and Countrywide and/or its division or subsidiary, America's Wholesale Lender were required to notify Plaintiffs of the assignment, sale, or transfer of the loan in writing at least fifteen (15) days before the event or at the time of settlement.

110.    Pursuant to 12 U.S.C. § 2607(a), Defendants were prohibited from paying any "fee, kickback, or thing of value" to any person as part of the real estate settlement service involving the loan described herein.

111.    Defendants WMC Mortgage Corp. and Countrywide and/or its division or subsidiary, America's Wholesale Lender, respectively, were required to disclose any "controlled business arrangements" as defined in 12 U.S.C. § 2602 to Plaintiff Jonathan Robinson and Plaintiff Silvas, respectively.

112.    Upon information and belief, Defendants WMC Mortgage Corp. and Countrywide and/or its division or subsidiary, America's Wholesale Lender, respectively, violated the RESPA by failing to provide Plaintiff Jonathan Robinson and Plaintiff Silvas, respectively, and others similarly situated, with the required documents described above within the time periods provided within the Act and/or provided Plaintiffs, and others similarly situated, with an inaccurate settlement statement and good faith estimate prior to closing of the transaction.

113.   Upon information and belief, Defendants WMC Mortgage Corp. and Countrywide and/or its division or subsidiary, America's Wholesale Lender, violated RESPA by failing to disclose a "controlled business arrangements" to Plaintiff Jonathan Robinson and Plaintiff Silvas.

114.   Upon information and belief, Defendants WMC Mortgage Corp. and Countrywide through its division or subsidiary, America's Wholesale Lender, violated RESPA by charging Plaintiff Jonathan Robinson and Plaintiff Silvas unreasonably high fees for real estate settlement services.

115.   Upon information and belief, Defendants WMC Mortgage Corp. and Countrywide through its division or subsidiary, America's Wholesale Lender, fraudulently misrepresented and concealed from Plaintiff Jonathan Robinson and Plaintiff Silvas the true facts related to the items subject to disclosure, and Plaintiffs did not discover Defendants' failure to make the required disclosures pursuant to 12 U.S.C. §§ 2601 and 2604 until within one (1) year of the filing of this Complaint.

116.   Based on Defendants' violations as described herein, Plaintiffs are entitled to damages under 12 U.S.C. §§ 2607 and 2608, and to claim damages for emotional distress according to proof.

117.   Based on Defendant's violations as described herein, Defendants WMC Mortgage Corp. and Countrywide and/or its division or subsidiary, America's Wholesale Lender are liable to Plaintiffs in an amount equal to three (3) times the amount of charges paid by Plaintiffs for "settlement services."

1

2

3

4

**THIRD CLAIM FOR RELIEF**
**(Violation of Home Ownership and**
**Equity Protection Act, 15 U.S.C. §§ 1602(aa), 1610, and 1639)**
**(As to Defendants GE Money, WMC Mortgage Corp., Wells Fargo, Countrywide**
**Home Loans, Inc., America's Wholesale Lender, and Bank of America)**

5

6

118.   Plaintiffs incorporate each and every paragraph of this Complaint as if fully set out in this claim.

7

8

9

10

11

12

13

119.   In 1994, Congress enacted the Home Ownership Equity Protection Act (hereinafter "HOEPA") as codified in 15 U.S.C. § 1639 et seq. with the intention of protecting homeowners from predatory lending practices targeting vulnerable consumers. HOEPA requires lenders to make certain defined disclosures and prohibits certain terms from being included in home loans.  In the event of noncompliance, HOEPA imposes civil liability for rescission plus statutory and actual damages.

14

15

16

17

18

19

20

120.   As defined in 15 U.S.C.A. § 1602(aa), the transaction between Plaintiff Jonathan Robinson and Defendant GE Money through its division or subsidiary WMC Mortgage Corp. was a "mortgage," being a consumer credit transaction other than a mortgage for the original purchase or construction of a dwelling, secured by Plaintiff's principal dwelling, Plaintiff was a "consumer," and Defendant GE Money, through its division or subsidiary WMC Mortgage Corp., was a "creditor."

21

22

23

24

25

121.   As defined in 15 U.S.C.A. § 1602(aa), the transaction between Plaintiff Silvas and Defendant Countrywide through its division or subsidiary, America's Wholesale Lender, was a "mortgage," being a consumer credit transaction other than a mortgage for the original purchase or construction of a dwelling, secured by Plaintiff's

principal dwelling, Plaintiff was a "consumer," and Defendant Countrywide through its division or subsidiary, America's Wholesale Lender, was a "creditor."

122.   Pursuant to 15 U.S.C.A. § 1639, Defendants GE Money through its division or subsidiary, WMC Mortgage Corp., and Countrywide through its division or subsidiary, America's Wholesale Lender, were required to make certain specified disclosures as listed below "not less than three (3) business days prior to the consummation of the transaction."

123.   Defendants GE Money, through it division or subsidiary, WMC Mortgage Corp., and Countrywide through its division or subsidiary, America's Wholesale Lender, violated HOEPA through numerous acts, material omissions, and a pattern of fraudulent concealment, including but not limited to the violation 15 U.S.C. § 1639 and by improperly, inadequately, or failing to disclose one or more of the following items:

   a.   The specific disclosure, in a "conspicuous type size," that "*You are not required to complete this agreement merely because you have received these disclosures or have signed a loan application*;"

   b.   The specific disclosures, in a "conspicuous type size," that "*If you obtain this loan, the lender will have a mortgage on your home.  You could lose your home, and any money you have put into it, if you do not meet your obligations under the loan*;"

   c.   The annual percentage rate;

   d.   The amount of the regular monthly payment if the interest rate was a fixed rate; or

e.      The annual percentage rate of the loan, the amount of the regular monthly payment, statement that the interest rate and monthly payment may increase, the amount of the maximum monthly payment if the transaction was other than a fixed interest rate transaction; and the amount financed.

124.   Defendants GE Money, through its division or subsidiary, WMC Mortgage Corp., and Countrywide, through its division or subsidiary, America's Wholesale Lender, violated 15 U.S.C. § 1639 by making loans to Plaintiff Jonathan Robinson, Plaintiff Silvas, and, upon information and belief, to others similarly situated, that included one or more of the following terms:

a.      A non-exempt prepayment penalty that was not within the exception contained in 15 U.S.C. § 139 (c)(2)(A)-(D);

b.      A "balloon payment" as defined in 15 U.S.C. 1639(e), which was due on a loan that had a term of less than five (5) years;

c.      Negative amortization as defined in 15 U.S.C. § 1639(f).

125.   Defendants GE Money through its division or subsidiary, WMC Mortgage Corp., and Countrywide through its division or subsidiary, America's Wholesale Lender, violated HOEPA by engaging in a pattern or practice of extending credit to Plaintiffs and other similarly situated individuals without regard to their ability to repay, including their current and expected income, current obligations, and employment, in violation of 15 U.S.C. §1639(h).

126.   The initial monthly payment on Plaintiff Jonathan Robinson's mortgage was $4,442.84 for twenty-four (24) months, equaling approximately 443.0% percent of Plaintiff's monthly income.

127.   The initial monthly payment on Plaintiff Silvas' loan was $1,633.29, subject to interest rate changes that could increase the payment from month to month as provided by the Adjustable Rate Rider.  This equaled approximately 93% of Plaintiff's joint income with her husband, notwithstanding any additional incurred debts outside of the subject loan.

128.   As to Plaintiff Jonathan Robinson and Plaintiff Silvas, Defendants WMC Mortgage Corp. and Countrywide through its division or subsidiary, America's Wholesale Lender, each made a loan regulated by 15 U.S.C. §§ 1602(aa) and 1639 without making the disclosures as set forth in paragraph 109(a) and 109(b) above.

129.   Additionally, Plaintiff Jonathan Robinson's First Note and Plaintiff Silvas' Note included provisions for prepayment penalties and the payments under the Plaintiff Jonathan Robinson's First Note and Plaintiff Silvas' Note note resulted in negative amortization, which are prohibited as set forth in paragraph 110(c).

130.   Upon information and belief, Wells Fargo, as assignee or purchaser of the Plaintiff Jonathan Robinson's loan, is subject to liabilities arising out of WMC Mortgage Corp.'s violation of the disclosure requirements of HOEPA.

131.   As a result of Defendants' violations as set forth herein, Plaintiffs are entitled to damages as set forth below, including, but not limited to statutory damages pursuant to 15 U.S.C. § 1640.

132.   Upon information and belief, Defendants GE Money and its division or subsidiary, WMC Mortgage Corp., and Countrywide and its division or subsidiary, America's Wholesale Lender, through their agent(s), fraudulently misrepresented and concealed the true facts related to the items subject to disclosure to Plaintiffs, and Plaintiffs discovered the Defendants' failure to make the disclosures pursuant to 15 U.S.C.A. § 1639 within one (1) year of the filing of this Complaint.

133.   Defendant Bank of America, as a successor to Countrywide Home Loans, Inc., is liable for the acts of Countrywide Home Loans as alleged herein.

**FOURTH CLAIM FOR RELIEF**
**(Violation of the Fair Housing Act,**
**42 U.S.C. § 3601, *et. seq.*)**
**(As to Defendants Countrywide Home Loans, Inc. and America's Wholesale Lender)**

134.   Plaintiffs incorporate each and every paragraph of this Complaint as if fully set out in this claim.

135.   The making of a loan, such as the loan to Plaintiff Silvas referred to herein, is a "real estate transaction" subject to the Fair Housing Act.

136.   Defendants Countrywide and its division or subsidiary, America's Wholesale Lender, at all material times hereto, were lenders subject to the federal Fair Housing Act, and were prohibited from discriminating against, or providing disparate treatment to, individuals on the basis of race, color, religion, sex, familial status, and national origin.

137.   Plaintiff Silvas is a member of the class of individuals subject to protection from discrimination and/or disparate treatment under the Federal Fair Housing Act.

138.   Upon information and belief, Defendant Countrywide Home Loans, Inc., and/or its division or subsidiary America's Wholesale Lender, respectively, purposefully targeted Plaintiff Silvas, and others similarly situated, as borrowers based on Plaintiff's race and/or national origin, knowing that Plaintiff suffered from language barriers inherent to Plaintiff's Hispanic origin, making Plaintiff vulnerable to predatory lending practices, including, but not limited to, violations of the Truth in Lending Act, the Real Estate Settlement Procedures Act, the Home Ownership and Equity Protection Act and the Arizona Consumer Fraud Act, as alleged herein.

139.   Upon information and belief, Defendant Countrywide Home Loans, Inc. and/or its division or subsidiary America's Wholesale Lender, offered Plaintiff Silvas, and others like her, a less-than-favorable loan than would have been offered to a white borrower, all other things being equal, in violation of the Federal Fair Housing Act based on the disparity between the loan terms which were available to Hispanic borrowers and the loan terms available to white borrowers.

140.   Defendant's violation of the Federal Fair Housing Act as alleged herein has caused Plaintiff to suffer damages, including, but not limited to, financial losses, damage to reputation, embarrassment, humiliation, and emotional distress, and Plaintiff has incurred attorneys' fees and costs in this matter.

141.   Defendant's violation of the Federal Fair Housing Act alleged herein was reckless, willful and wanton, entitling Plaintiff Silvas to an award of punitive damages against Defendant Countrywide Home Loans, Inc. and/or its division or subsidiary America's Wholesale Lender.

142.    Upon information and belief, Defendant's violation of the Federal Fair Housing Act as alleged herein is and/or has been a continuing violation whereby Defendant has engaged in a pattern or extended practice of exploiting the market of Hispanics in the market area where Plaintiff resides.

### FIFTH CLAIM FOR RELIEF
**(Violation of the Fair Debt Collection Practices Act,**
**15 U.S.C. § 1692, *et. seq.*)**
**(As to Defendant Wells Fargo, America's Servicing Company, and First American**
**Title Insurance Company)**

143.    Plaintiffs incorporate each and every paragraph of this Complaint as if fully set out in this claim.

144.    The making of a loan, such as the loan made to Plaintiff and referred to herein, is a "real estate related transaction" subject to the Fair Debt Collection Practices Act.

145.    At all times material hereto, Plaintiff Jonathan Robinson was a "consumer" as defined in 15 U.S.C. § 1692(a)(3), as Plaintiff was obligated pursuant to the loan transaction described herein to pay a debt to Defendant under the Note and Deed of Trust described herein.

146.    Defendant Wells Fargo was a "debt collector" as defined in 15 U.S.C. § 1692(a)(6), as Defendant utilized the name of America's Servicing Company, which was a name other than its own, and was a third party who was attempting to collect a debt on behalf of Defendant Wells Fargo.   America's Servicing Company was an affiliate of Defendant Wells Fargo.

147.   On or about December 3, 2008, Defendant Wells Fargo, operating as America's Servicing Company, issued a Notice of Trustee's Sale.  Upon information and belief, Defendant Wells Fargo was not the holder of the note, and the note had not been assigned.

148.   Upon information and belief, Defendant Wells Fargo, operating as America's Servicing Company, improperly issued the Notice of Trustee's Sale, thereby violating 15 U.S.C. 1692(f)(6), which prohibits taking or threatening to take non-judicial action to effect dispossession of property if there is no present right to possession of the property claimed as collateral through an enforceable security interest.

149.   Defendants, and each of them, used false, deceptive and misleading representations to Plaintiff by failing to disclose any transfers in connection with the Note, in violation of 15 U.S.C. 1692(f).

150.   Upon information and belief, Defendants sent false, deceptive and misleading correspondence and coupons to Plaintiffs that misstated the amount of the payments owed and the monetary amount needed to bring the mortgage current.

151.   Upon information and belief, Defendants knowingly misrepresented to Plaintiffs that Plaintiffs would be offered a loan modification opportunity tailored to fit their unique financial situation and permit them to stay in their Residence.

152.   Defendant Wells Fargo, operating as America's Servicing Company, improperly published that Plaintiff's property was in foreclosure and that Defendant Wells Fargo was a proper party to initiate foreclosure.

153.    Defendants' violation of the Federal Debt Collection Practices Act as alleged herein has caused Plaintiffs to suffer damages, including, but not limited to, financial losses, damage to reputation, embarrassment, humiliation, and emotional distress, and Plaintiffs have incurred attorneys' fees and costs in this matter.

154.    Defendants' violation of the Federal Debt Collection Practices Act alleged herein was reckless, willful and wanton, entitling Plaintiffs to actual and statutory damages.

## SIXTH CLAIM FOR RELIEF
**(Violation of the Arizona Consumer Fraud Act, A.R.S. §§ 44-1521, *et seq.*)**
**(As to Defendants GE Money, WMC Mortgage Corp., Countrywide Home Loans, Inc., and America's Wholesale Lender)**

155.    Plaintiffs incorporate each and every paragraph of this Complaint as if fully set out in this claim.

156.    A.R.S. § 44-1522 prohibits the use of any "deceptive act or practice" in connection with real estate transactions.

157.    A.R.S. § 44-1522(B) permits interpretations of 15 U.S.C.A. §§ 44, 52, and 55(a)(1), the Federal Trade Commission Act, to be used as a guide in interpreting the term "deceptive."  Interpretations of the term include representations that have a "tendency and capacity" to convey misleading impressions to consumers even though interpretations that would not be misleading are also possible.  *Chrysler Corp. v. FTC*, 561 F.2d 357, 363 (D.C.Cir. 1977).   In evaluating the representations, the test is whether the least sophisticated individual would be misled.  *Exposition Press, Inc. v. FTC*, 295 F.2d 869, (2d Cir. 1961), *cert. denied* 370 U.S. 917, 82 S.Ct. 1544 (1962).

158.    Upon information and belief, Defendant WMC Mortgage Corp. and Countrywide and its division or subsidiary, America's Wholesale Lender, respectively, used deception, false promises, and misrepresentations regarding the terms of the loan offered to Plaintiff Jonathan Robinson and Plaintiff Silvas, respectively, by misrepresenting, concealing, or omitting the terms of the loan, including, but not limited to, the interest rate, the payments to be made under the loan, Plaintiffs' ability to qualify for the loan, and Plaintiffs' ability to refinance the loan in the future.   Such facts were material in that Defendants intended, and knew or should have known, that Plaintiffs would rely upon Defendants' representations in entering into the loan as alleged herein.

159.    Plaintiffs did rely on Defendants' representations concerning the terms of the loans and Plaintiffs' ability to repay the loans, as evidenced by Plaintiffs' acts in entering into the loans.

160.    Upon information and belief, Defendants WMC Mortgage Corp. and Countrywide through its division or subsidiary, America's Wholesale Lender, and Countrywide, individually, each made loans to Plaintiff Jonathan Robinson, Plaintiff Silvas, and Plaintiff Holbert, respectively, without making a determination based on a commercially reasonable means or mechanism of Plaintiffs' ability to repay the loans.

161.    Upon information and belief, Defendants knew, or should have known, that Plaintiffs would be incapable of making loan payments as required by the terms of the loan based upon Plaintiffs' income.

162.   Defendants WMC Mortgage Corp. and Countrywide and its division or subsidiary, America's Wholesale Lender, and Countrywide, individually, omitted and concealed the magnitude of Plaintiffs' risk of losing their homes.

163.   The deceptive practices of Defendants WMC Mortgage Corp. and Countrywide through its division or subsidiary, America's Wholesale Lender, misled Plaintiff Jonathan Robinson and Plaintiff Silvas into believing that they would be able to refinance the loan before the initial "teaser" rate was set to expire.

164.   Defendant Countrywide used deception, false promises, and misrepresentations regarding the terms of the Repayment Plan Agreement offered to Plaintiff Holbert with the intent of inducing Plaintiff Holbert into breaching the terms of the Deed of Trust on the Holbert Residence by falling behind on her monthly loan payments, increasing her risk of losing her home.  By informing Plaintiff Holbert that entering into the Repayment Plan Agreement would be the only way in which to modify her loan and achieve an affordable monthly payment, Defendant intended, and knew or should have known, that Plaintiff would rely upon Defendant's representations in entering into the Repayment Plan Agreement as alleged herein.

165.   Plaintiff Holbert did rely on Defendant Countrywide's representations concerning the Repayment Plan Agreement and its significance in obtaining a loan modification, as evidenced by Plaintiff entering into the agreement.

166.   Defendants' acts in negotiating the loans to Plaintiffs constitute the "sale or advertisement" of "merchandise" under A.R.S § 44-1522.

167.    Plaintiffs learned of Defendants' violations of A.R.S. § 44-1522 within one (1) year of filing this complaint.

168.    As a proximate result of the violations stated above, Defendants are liable to Plaintiffs for statutory damages according to the Arizona Consumer Fraud Act, for actual damages (including emotional distress) according to proof, and attorneys' fees and costs.

169.    Moreover, the conduct of Defendants in violation of the Arizona Consumer Fraud Act was so contemptible and egregious that Plaintiffs are entitled to punitive damages in an amount appropriate to punish Defendants and deter others from engaging in similar conduct.

### SEVENTH CLAIM FOR RELIEF
**(Conspiracy to Commit Fraud and Conversion)**
**(As to Defendants WMC Mortgage Corporation, GE Money, Wells Fargo, America's Servicing Company, Countrywide Home Loans, Inc., America's Wholesale Lender, and MERS, Inc.)**

170.    Plaintiffs incorporate each and every paragraph of this Complaint as if fully set out in this claim.

171.    In connection with the application and consummation of the loans that are the subject of this action, Defendants WMC Mortgage Corp., GE Money, Wells Fargo, America's Servicing Company and MERS, Inc. conspired and formed an association designed to deprive Plaintiffs Robinson of their property through fraud and misrepresentation which would result in Plaintiff Jonathan Robinson entering a loan for which he was clearly not qualified.

172.    Similarly, Defendants Countrywide, through its division or subsidiary America's Wholesale Lender, Countrywide individually, and MERS, Inc. conspired and

- 39 -

formed an association to deprive Plaintiffs Silvas and Holbert of their interest in their respective properties through fraud and misrepresentation, which would result in Plaintiffs entering loans for which they were clearly not qualified.

173.   Upon information and belief, Defendants, and each of them, intended that the loan would be packaged and sold on the secondary market, resulting in a substantial profit to the Defendants.

174.   Defendants, and each of them, knew prior to their origination of the loans and subsequent transfer of the loans, that Plaintiffs were not qualified to make the loans. However, Defendants knew, or should have known, that Plaintiff Jonathan Robinson and Plaintiff Silvas would rely, and did rely, on Defendants' representations as alleged herein related to Plaintiffs' ability to repay the loans or to refinance the loans in taking the loans and signing the documents.   Similarly, Defendants knew, or should have known, that Plaintiff Holbert would rely, and did rely, on Defendant Countrywide's representation as alleged herein related to Plaintiff's ability to modify her loan strictly by way of breaching the provisions of her Deed of Trust and entering into a Repayment Plan Agreement.   As previously alleged herein, such representations violated Arizona's Consumer Fraud Act.

175.   As previously alleged herein, Defendant GE Money Bank through its division or subsidiary, WMC Mortgage Corp., violated the Truth in Lending Act, the Real Estate Settlement Procedures Act, the Federal Fair Debt Collection Practices Act, the Home Ownership and Equity Protection Act, and the Arizona Consumer Fraud Act in procuring Plaintiff Jonathan Robinson's signature on the First and Second Notes and accompanying Deeds of Trust.

176.   As previously alleged herein, Defendants Countrywide and its division or subsidiary, America's Wholesale Lender, violated the Truth in Lending Act, the Real Estate Settlement Procedures Act, the Federal Fair Housing Act, the Home Ownership and Equity Protection Act, and the Arizona Consumer Fraud Act in procuring Plaintiff Silvas' signature on the Note and Deed of Trust.

177.   As previously alleged herein, Defendant Countrywide violated the Arizona Consumer Fraud act in procuring Plaintiff Holbert's signature on the Note and Deed of Trust and subsequent Repayment Plan Agreement, which mandated Plaintiff breaching the terms of the Deed of Trust.

178.   Defendants' legal objective of packaging and selling the loan was accomplished by illegal means in procuring the loan because of Defendants' violation of the Truth in Lending Act, the Real Estate Settlement Procedures Act, the Federal Fair Debt Collection Practices Act or the Federal Fair Housing Act, the Home Ownership and Equity Protection Act, and the Arizona Consumer Fraud Act as alleged herein.

179.   Upon information and belief, as an alternative to packaging and selling Plaintiffs' loans, Defendants knew that the loans would be subject to foreclosure as a result of Plaintiffs Robinsons' and Silvas inability to make payments on the loans as the monthly payment escalated during the term of the loan resulting in Plaintiffs' inability to qualify to refinance their loans at a later date after the payments began to escalate because of changes in their interest rates.

180.   Upon information and belief, the escalating payments and/or increases in the interest rate were not properly disclosed to Plaintiffs Robinson and Silvas as alleged herein.

181.   Defendants intended that Plaintiffs would default on the loans and Defendants would be in a position of seizing Plaintiffs' respective property in a foreclosure action, unlawfully depriving Plaintiffs of their property.

182.   Upon information and belief, Defendants knew that they would be unable to modify Plaintiffs' loan into a payment plan Plaintiffs could afford.

183.   Defendants, and each of them, in furtherance of the conspiracy and agreement alleged herein, acted in a concerted manner to target Plaintiff Jonathan Robinson, Plaintiff Silvas and Plaintiff Holbert as borrowers, to misrepresent the loans' terms and/or to misrepresent Plaintiffs' qualifications for the loans, and to mislead Plaintiffs into relying on the potential of an affordable loan modification that would never manifest, knowing that such action or actions would result in Defendants' ultimate possession of Plaintiffs' property following foreclosure.

184.   The actions of the various Defendants were interrelated and could not have been accomplished without the participation of all of the Defendants.  The actions of all of the Defendants were committed intentionally, willfully, wantonly and with reckless disregard for the rights of Plaintiffs.

185.   As a result of Defendants' conspiracy described herein, Plaintiffs have suffered injuries which include mental anguish, emotional distress, embarrassment, humiliation, loss of reputation and a decreased credit rating which has, or will, impair

Plaintiffs' ability to obtain credit at a favorable rates before the decrease in their credit rating, the loss or anticipated loss of their property, and other financial losses according to proof.  Plaintiffs have incurred attorneys' fees and costs in this matter.

186.   Defendants' conspiracy to unlawfully deceive Plaintiffs into the loan alleged herein was willful, wanton, and justify an award of actual, compensatory and punitive damages.

### EIGHTH CLAIM FOR RELIEF
**(Conspiracy To Commit Fraud Related To MERS System)**
**(As to Defendants MERSCORP, Inc., MERS, Inc., Freddie Mac, Fannie Mae, GMAC Mortgage, L.L.C., National City Mortgage, National City Bank, National City Corporation, J.P. Morgan Chase Bank, N.A., CitiMortgage, Inc., Countrywide Home Loans, Inc., HSBC Mortgage Corporation, U.S.A., Wells Fargo Bank, N.A., America's Servicing Company, GE Money Bank, Bank of America, N.A., and AIG United Guaranty Corporation)**

187.   Plaintiffs incorporate by this reference each and every paragraph of this Complaint as if set forth fully herein.

188.   Upon information and belief, Defendants MERSCORP, Inc., MERS, Inc., Freddie Mac, Fannie Mae, GMAC Mortgage, L.L.C., National City Mortgage, National City Bank, J.P. Morgan Chase Bank, N.A., CitiMortgage, Inc., Countrywide Home Loans, Inc., HSBC Mortgage Corporation, Wells Fargo Bank, N.A., America's Servicing Company, GE Money Bank, Bank of America, N.A., and AIG United Guaranty Corporation (hereinafter in this Eighth Claim for Relief collectively referred to for purposes of this Eighth Claim as the "Defendant conspirators"), and each of them, did knowingly and willfully conspire and agree among themselves to engage in a conspiracy to promote, encourage, facilitate and actively engage in  fraudulent and predatory lending

practices perpetrated on Plaintiffs as alleged in the Seventh Claim for Relief herein by the actions of the Defendant conspirators as part of the business policies and practices of each Defendant conspirators in participating in the MERS system.

189.   Upon information and belief, the Defendant conspirators are or have been shareholders in MERSCORP, Inc., MERS, Inc. and/or members of the MERS system, and, as to Defendant conspirators, Freddie Mac, Fannie Mae, GMAC Mortgage, L.L.C., National City Mortgage, and J.P. Morgan Chase Bank, N.A., have, through their employees and agents, served as members of the Board of Directors of MERSCORP, Inc. and/or MERS, Inc., and participated in the design and coordination of the MERS system described in this complaint

190.   Defendants' participation as shareholders, directors, operators, or members of MERSCORP, Inc. and/or MERS, Inc. are as follows:

a.      Defendants J.P. Morgan Chase Bank, CitiMortgage, Inc., Countrywide Home Loans, Inc., Fannie Mae, Freddie Mac, Merrill Lynch, AIG United Guaranty Corporation, and Wells Fargo Bank, N.A. are each Shareholders of MERSCORP, Inc.

b.      MERSCORP, Inc.  is the operating company that owns and operates the MERS System described herein, and is the parent company of Mortgage Electronic Registration Systems, Inc. ("MERS, Inc.").

c.      Defendants Freddie Mac, MERSCORP, Inc., National City Mortgage, Fannie MAE, and AIG United Guaranty Corporation are directors of MERS, Inc. and/or MERSCORP, Inc.

d.    Defendants Freddie Mac, Fannie Mae, GMAC Mortgage, L.L.C., National City Mortgage, National City Bank, National City Corporation, J.P. Morgan Chase Bank, N.A., CitiMortgage, Inc., Countrywide Home Loans, Inc., HSBC Mortgage Corporation, U.S.A., GE Money Bank, Bank of America, N.A., Wells Fargo Bank, N.A., America's Servicing Company, and AIG United Guaranty Corporation are Members of MERS, Inc.

191.    Whenever this Complaint refers to any corporation's act, deed, or transaction, it means that such corporation engaged in the act, deed, or transaction by or through its members, officers, directors, agents, employees, or other representatives while they actively were engaged in the management, direction, control, or transaction of its business or affairs.

192.    Beginning at a time unknown to the Plaintiffs, prior to 2004, and continuing through at least the present, the Defendant co-conspirators engaged in a conspiracy to unlawfully deprive borrower-homeowners of property in numerous states through issuing predatory loans as described herein, and through the securitization and subsequent processes described herein.

193.    MERS, Inc. and/or MERSCORP, Inc. arranged for bilateral and multilateral meetings, bilateral and multilateral teleconferences, and bilateral internet communications with potential Shareholders, actual Shareholders, candidates for Membership, and Members.

194.    Upon information and belief, the Defendant conspirators have conspired among themselves and with other unknown parties to:

- 45 -

a.      develop a system of earning profits from the origination and securitization of residential loans without regard for the rights of Plaintiffs, and others similarly situated, by engaging in predatory and deceptive residential lending practices as alleged in this complaint above; and

b.      in furtherance of the system referred to immediately above, the  Defendant conspirators intentionally created, managed, operated and controlled the Defendants MERSCORP, Inc. and MERS, Inc. for the specific purpose of MERS, Inc. being designated as a sham "beneficiary" in the original deeds of trust securing those loans, including the loan made to Plaintiffs and other similarly situated individuals by GE Money Bank and/or its division or subsidiary WMC Mortgage and Countrywide Home Loans, Inc. and/or its division or subsidiary America's Wholesale Lender; and

c.      Defendant conspirators intentionally created, managed, operated and controlled the MERS system with the unlawful intent and for the unlawful purpose of making it difficult or impossible for Plaintiffs and other victims of such industry-wide predatory policies and practices to identify and hold responsible the persons and entities responsible for the unlawful actions by GE Money Bank and/or its division or subsidiary WMC Mortgage, Countrywide Home Loans, Inc. and/or its division or subsidiary America's Wholesale Lender, MERS, Inc. and their co-conspirators.

195.   Upon information and belief, Defendant conspirators, through creation of the MERS system alleged herein, adopted and implemented residential lending underwriting guidelines for use in Arizona and in other states which:

a.      were intended to, and did, generate unprecedented profits for the Defendant conspirators and their co-conspirators at the expense of Plaintiffs and other persons who were fraudulently induced by the Defendant conspirators and their co-conspirators into taking out residential loans that were known by the Defendant conspirators and their co-conspirators, at the time the loans were originated, and

b.      were likely to result in foreclosure on those loans and loss by Plaintiffs and other borrowers of their homes, with reckless disregard and intentional indifference by the Defendant conspirators and their co-conspirators of the likelihood of such foreclosure.

196.    Removing real estate transaction records from the public record maintained by the county clerks prevents oversight of real estate transactions by the public and by public officials.

197.    MERSCORP, Inc. informed its co-conspirators that using the MERS system would remove transaction records from the public record.

198.    MERSCORP, Inc. and/or MERS, Inc. have publicly stated the following:

a.      "MERS eliminates the need to prepare and record assignments when trading residential and commercial mortgage loans."

b.      "With the recording of the security instrument(s), MERS becomes the mortgagee in the county land records and no assignments are required during a subsequent sale and transfer of the loan between MERS members."

c.      "There is no dependency on the corporate name you use on closing documents and the corresponding corporate name on the MERS System because the MERS System is not the legal system of record of ownership of mortgage loans."

199.   Upon information and belief, the MERS system was created for the unlawful purpose of hiding and insulating the brokers and originators of predatory toxic loans from accountability and liability by creating an entity which simultaneously informed all lenders who originated loans that named MERS as the beneficiary of the following:

a.   MERS would never own or acquire any actual beneficial interest in any loan in which it was named as beneficiary under the deed of trust, and that

b.   MERS could be named as beneficiary for purposes of public notice and notice to the borrower and would act in that capacity if so designated by the lender who originated the loan.

200.   Upon information and belief, the intent and purpose of the Defendant conspirators and their co-conspirators in the creation, management, operation and control of MERS was, without limitation, to make it impossible for the borrowers, their attorneys, the courts, the government, and anyone other than the Defendant conspirators who created and controlled MERS to identify the actual beneficial owner of any particular loan or the property which was the collateral securing that loan until such time, if any, that foreclosure action was initiated.   As a result, Plaintiffs, and other similarly situated individuals, were deprived of the right to attempt to modify their toxic loans, as the true identity of the actual beneficial owner was intentionally hidden from Plaintiffs and other similarly situated individuals.

201.   MERSCORP, Inc.'s marketing materials also promise Members with assistance with foreclosures.  MERSCORP, Inc. and/or MERS, Inc. have publicly stated:

"MERS has assembled a Foreclosure Manual to provide a state-by-state guideline for our Members to follow when foreclosing a mortgage loan in the name of MERS."

202.    Upon information and belief, the Defendant conspirators' actions in creating the MERS system, which was dependent on fraudulent and deceptive practices that included, but were not limited to, making loans to consumers such as Plaintiffs in violation of the Truth in Lending Act, the Real Estate Settlement Procedures Act, and the Home Ownership and Equity Protection Act, created a system to unlawfully deprive Plaintiffs of their interest in their Residences.

203.    MERSCORP, Inc. and/or MERS, Inc. offered Members increased profit. MERSCORP, Inc. has publicly stated:

a.     "The MERS web site enables you to target directly your MERS® Ready products and services to MERS members."

b.     "Commercial originators and issuers save *hundreds to thousands of dollars* (in the case of cross-collateralized loans) in preparing and recording assignments. Where the originator has not recorded a MERS as Original Mortgagee (MOM) security instrument, the issuer saves the costs of assigning to the Trust by having the originator assign to MERS."  (Emphasis added).

c.     "It will reduce risk and generate more profits for lenders because the Notes registered on it will be in electronic format. *It shortens the timeframe between the closing and the securitization of the loan*, enabling the Note to move instantly, creating faster funding."   (Emphasis added).

204.    MERSCORP, Inc.'s rules and by-laws, to which MERS Members agree, require the following:

> **BY COMPLETING, SIGNING, AND SUBMITTING THIS APPLICATION, THE APPLICANT IS AGREEING TO BE A MERS MEMBER. THE APPLICANT HEREBY AGREES TO PAY ALL FEES AND EXPENSES SET FORTH IN THE MERS RESIDENTIAL FEE SCHEDULE, WHICH MAY CHANGE FROM TIME TO TIME; ABIDE BY ALL EXISTING MERS RULES AND PROCEDURES, WHICH ARE INCORPORATED HEREIN BY REFERENCE AND MAY BE AMENDED FROM TIME TO TIME; AND COMPLY WITH THE TERMS AND CONDITIONS SET FORTH IN THE ATTACHED ADDENDUM ENTITLED TERMS AND CONDITIONS.**

(Emphasis in original).

205.    The MERSCORP, Inc. rules and by-laws, to which MERS Members agree, cannot be carried out lawfully because they require the following:

> 1. ***MERS, which shall include MERSCORP, Inc. and Mortgage Electronic Registration Systems, Inc.***, and the Member shall abide by these Terms and Conditions, the Rules and Procedures (collectively, the "Governing Documents"), copies of which will be supplied upon request. The Governing Documents shall be a part of the terms and conditions of every transaction that the Member may make or have with MERS or the MERS® System either directly or through a third party. The Member shall be bound by any amendment to any of the Governing Documents.  2. ***The Member, at its own expense, shall promptly, or as soon as practicable, cause MERS to appear in the appropriate public records as the mortgagee of record with respect to each mortgage loan*** that the Member registers on the MERS® System. ***MERS shall serve as mortgagee of record with respect to all such mortgage loans solely as a nominee***, in an administrative capacity, for the beneficial owner or owners thereof from time to time. ***MERS shall have no rights whatsoever*** to any payments made on account of such mortgage loans, to any servicing rights related to such mortgage loans, or to any mortgaged properties securing such mortgage loans. ***MERS agrees not to assert any rights*** (other than rights

specified in the Governing Documents) with respect to such mortgage loans or mortgaged properties. References herein to "mortgage(s)" and "mortgagee of record" shall include deed(s) of trust and beneficiary under a deed of trust and any other form of security instrument under applicable state law.  ***  6. MERS and the Member agree that: (i) *the MERS® System is not a vehicle for creating or transferring beneficial interests in mortgage loans*, (ii) transfers of servicing interests reflected on the MERS® System are subject to the consent of the beneficial owner of the mortgage loans, and (iii) membership in MERS or use of the MERS® System shall not modify or supersede any agreement between or among the Members having interests in mortgage loans registered on the MERS® System."

(Emphasis added).

206.    The times, dates, and locations of the various meetings and communications among and between the conspirators are solely within the knowledge of the conspirators and have not been made public by MERS or its co-conspirators.

207.    In addition to the allegations made related to the shareholder, director, and creator conspirators, the MERS system conspiracy consisted of:

a.    The Lender conspirators who agreed to procure loans by means of violation of state and Federal lending laws, as further described in the previous claims for relief.

b.    The Lender, Securitizer, and Servicer conspirators who agreed to use the MERS system unlawfully and in violation of state and Federal laws to deceive homeowners and securities purchasers by misleading them to believe that the conspirators had legal authority to foreclose when in fact, the conspirators do not have legal authority to foreclose on loans which were made part of the MERS system, as further described in the previous claims for relief.

c.      The Securitizer conspirators who were aware of these violations of law during procurement and agreed to purchase the loans knowing that the law had been violated.

d.      The Securitizer conspirators who, upon information and belief, packaged and sold loans knowing that such loans were based on deeds of trust that had been split from the notes, and based on loans that had been sold as part of the securitization process before the loans were finalized with the borrowers.  Thereafter, the purported interest in the obligation, the note as evidence of the obligation, and the security interest for the obligation were transferred multiple times without recording the change in ownership of an interest in real property in the appropriate county records.  This was accomplished by the creation of the private parallel record keeping service known as the MERS system, whereby MERS, Inc. is named in the deed of trust that is supposed to be the security for the underlying loan obligation.  MERS is named as the nominee of the lender, but not as the holder of the note or the actual lender. Rather, MERS is named as beneficiary for the purpose of deceiving the borrower and the clerk's office where the deed of trust is recorded.  As a result of MERS being named as the beneficiary, and through the processes described herein, the note and deed of trust are "split."  The monetary effect of utilizing the MERS system, in addition to the allegations set forth otherwise herein, was to hide profits and fees that were not disclosed to the borrower or to the investor in the note, which, in some cases, upon information and belief, were in excess of the principal value stated on the note.

e.      A securitization process that was based on loans that were made based on residential loan underwriting guidelines that were designed to generate as many loans as possible to fuel the securitization process to feed the demand for mortgage-backed securities, the faulty and toxic nature of which loans was hidden by the MERS system.

f.      The Securitizer conspirators who violated state and Federal securities laws through their descriptions of the financial derivatives created by the conspiracy.

g.      The Lender conspirators who agreed to supply loans to the Securitizers despite knowledge that the Securitizers would sell them in violation of the law.

h       The Servicer conspirators who agreed to unlawfully foreclose on loans despite the separation of the loan from the deed of trust that made the foreclosure unlawful.

208.    All of the conspirators agreed to the participation of the other conspirators in their individual roles in the conspiracy.  The loan files of each of the loans disclose the legal violations and document that the Lenders agreed to purchase loans from third party originators and to sell them to the Securitizers.  The Securitizers agreed to purchase the loans and pool them with full knowledge of the contents of the loan files.  The Servicers agreed to foreclose with full knowledge of the loan file for each loan.

209.    All of the conspirators continued to agree to the conspiracy over the course of thousands of transactions.

210.    Defendants Fannie Mae, Freddie Mac, J.P. Morgan Chase Bank, N.A., GMAC Mortgage, L.L.C., and National City Mortgage acted as Creators of the conspiracy. They created MERS to hide their own unlawful activity as well as the activities of their co-conspirators.

211.   Defendants GE Money Bank and its division or subsidiary, WMC Mortgage, Countrywide Home Loans, Inc. and its division or subsidiary, America's Wholesale Lender, National City Bank, HSBC Mortgage Corporation, U.S.A., GMAC Mortgage, L.L.C., National City Mortgage, CitiMortgage, G.E. Money Bank, Wells Fargo Bank, N.A., J.P Morgan Chase and Bank of America, N.A. acted as Lenders in the conspiracy.

212.   Defendants J.P. Morgan Chase, Wells Fargo Bank, N.A., Bank of America, HSBC Mortgage Corporation (USA), GMAC Mortgage, L.L.C., National City Mortgage, National City Bank, Countrywide Home Loans, Inc., CitiMortgage and GE Money Bank acted as Securitizers in the conspiracy.

213.   Defendants America's Servicing Company, Countrywide Home Loans, Inc., Bank of America, Wells Fargo Bank, N.A., GMAC Mortgage, L.L.C., CitiMortgage, Inc., National City Mortgage, J.P. Morgan Chase, and HSBC Mortgage Corporation, U.S.A. acted as Servicers in the conspiracy.

214.   For the purpose of forming and effectuating this conspiracy, Defendants and co-conspirators did the following things, among others:

a.   The Defendants acting as Lenders described above systematically and repeatedly violated Federal and state lending laws in order to originate mortgages, as described in the previous claims for relief;

b.   The Defendants acting as Securitizers knowingly and by agreement purchased the unlawfully obtained mortgages from the Lenders;

c.      The Defendants acting as Lenders, Securitizers and Servicers utilized and benefited from the MERS system as a means of preventing detection by law enforcement or by the public and as a means of unlawful foreclosure to the detriment of homeowners;

d.      The Defendants acting as Lenders and Securitizers, with knowledge and agreement of the co-conspirators, utilized the MERS system in such a manner as to split the promissory note from the mortgage or deed of trust and thereby destroy the note holders' security, nevertheless proceeding with unlawful foreclosure actions to the detriment of homeowners;

e.      All Defendants named herein as co-conspirators profited from their respective roles in originating loans, selling them, and pooling their MERS registered home loans together in large bundles that were sold and turned into financial derivative instruments;

f.      The mortgage securitization process became known in financial industry parlance as "slicing and dicing." The slicing and dicing results in a pool of mortgages which have lost their individual characteristics but which have a high value to those who create them;

g.      The Defendants acting as Securitizers named herein purchased mortgages from the Defendants acting as Lenders named herein for securitization;

h.      The Defendants named as Securitizers herein sold the securitized and pooled mortgages as asset backed financial derivatives with affirmative claims that Defendants were unaware of any legal issues which would affect the value of the assets backing the securities, which was untrue, as Defendants actually knew or should have known that the

mortgages were unlawfully obtained and subject to rescission, and knew or should have known that the mortgages and promissory notes had been split and therefore the note holder no longer had the right to foreclose, assuming that it ever did;

i.     The Defendants described herein as Servicers unlawfully foreclosed on homeowners' properties.  The Servicers misrepresented that they had legal right to foreclose, when, in fact, they did not.  The Servicers' foreclosures illegally deprived homeowners of property;

j.     All Defendants named as MERS members agreed to promote MERS, an ostensibly lawful business, and to utilize MERS in an unlawful manner to deprive Plaintiffs and those similarly situated of property.

215.   The securitization process took distinct loans, deeds of trust, and mortgages, and pooled them together in such a manner that they lost their unique identity.  Hundreds of such financial derivative instruments were created by the co-conspirator Defendants. The co-conspirators all profited from their respective roles in the process, including, but not limited to, the following pooling agreements:

a.     Defendant and co-conspirator Wells Fargo Bank, N.A. is the master servicer of the HSI Asset Loan Obligation Trust 2007-2.  Approximately 18% of the mortgages in that loan pool were originated by Defendant Countrywide Home Loans, Inc. Approximately 26% of the mortgages in that pool originated from HSBC Mortgage Corporation (USA).   HSBC Mortgage Corporation (USA) profited from packaging its loans together with those of Defendant and co-conspirator Countrywide Home Loans, Inc.

b.      The HSI Asset Loan Obligation Trust 2006-2, was sponsored and sold by HSBC Bank.  Countrywide Home Loans, Inc. originated 13% of the loans in this instrument.  HSBC Mortgage Corporation (USA) originated 15% of the loans in this instrument.  HSBC Mortgage Corporation (USA) is one of the servicers of this financial derivative instrument.

c.      The Banc of America Funding 2007-4 Trust was sponsored by Defendant and co-conspirator Bank of America, N.A.  The Master Servicer of this financial derivative instrument is Defendant and co-conspirator Wells Fargo Bank, N.A.  GMAC Mortgage, L.L.C. and America's Servicing Company are also among the servicers.  The originators of the loans pooled in this instrument include Defendants and co-conspirators GMAC Mortgage, L.L.C., Countrywide Home Loans, Inc., Wells Fargo Bank, N.A., Bank of America, N.A., National City Mortgage Co.

d.      The Banc of America Funding 2007-7 Trust was sponsored by Defendant and co-conspirator Bank of America, N.A.  The Master Servicer of this financial derivative instrument is Defendant and co-conspirator Wells Fargo Bank, N.A.  GMAC Mortgage, L.L.C. and America's Servicing Company are also among the servicers.  The originators of the loans pooled in this instrument include Defendants and co-conspirators GMAC Mortgage, L.L.C., Countrywide Home Loans, Inc., Wells Fargo Bank, N.A., Bank of America, N.A., National City Mortgage Co.  The Banc of America Funding 2007-7 Trust hired Defendants and co-conspirators Bank of America, N.A., CitiMortgage, Inc., GMAC Mortgage, LLC, and National City Mortgage Co. as servicers.

e.      National City Mortgage Corporation is an originator and servicer of loans in the GSAA Home Equity Trust Series 2007-8.  Wells Fargo Bank, N.A. and America's Servicing Company are also servicers.  In the prospectus, National City Mortgage is described as a division of National City Bank.

f.      In the Structured Adjustable Rate Mortgage Loan Trust Mortgage Pass-Through Certificates, Series 2007-6, Defendant GE Money Bank was one of the major underwriters of the loans which were pooled.  Defendant and Co-conspirator U.S. Bank, N.A. was also an originator of loans in the pool.  U.S. Bank, N.A. is also a servicer.  U.S. Bank National Association and Wells Fargo Bank, N.A. were hired as custodians of the trust.

g.      Defendant and co-conspirator Wells Fargo Bank, N.A. is the master servicer of the HSI Asset Loan Obligation Trust 2007-2.  18% of the mortgages in that loan pool were originated by Defendant Countrywide Home Loans, Inc.  26% of the mortgages in that pool originated from HSBC Mortgage Corporation (USA).   HSBC Mortgage Corporation (USA) profited from packaging its loans together with those of Defendant and co-conspirator Countrywide Home Loans, Inc.

h.      In the J.P. Morgan Alternative Loan Trust 2007-A2, J.P. Morgan Chase Bank was an originator of loans that were pooled.    J.P. Morgan Chase Bank, National Association is one of the servicers of the mortgage pool.  Wells Fargo Bank, N.A. is the master servicer.  U.S. Bank National Association is the trustee.  Countrywide Home Loans, Inc. sold loans to the trust.  J.P. Morgan Chase Bank and America's Servicing Company are two of the servicers.

216.    Upon information and belief, Plaintiffs' loans were securitized, "sliced and diced" and pooled into mortgage pools such as the ones described herein as part of the conspiracy related to the creation and operation of the MERS system, and Defendants, and each of them, profited from same and are liable for their acts and the acts of their co-conspirators in creating the MERS system, including, but not limited to, the use of MERS-approved and created documents to establish the loans (including, but not limited to, the form of deed of trust), and in participating in the securitization process described herein.

216.    Upon information and belief, Defendant conspirators utilized funds received as part of the Troubled Asset Relief Program payouts to further the conspiracy to defraud Plaintiffs, and others similarly situated, to deprive them of their money, to deprive them of their property, to unlawfully foreclose on loans made to putative class members, to pay investors in the mortgage-backed securities which were comprised of the loans made to Plaintiffs and others similarly situated, and to pay bonuses to employees and officers of the Defendant conspirators based on their devising the subprime mortgage-backed products which were securitized by loans of the type issued to Plaintiffs and others similarly situated, and collateralizing and selling such products in the United States and abroad.

218.    As a result of Defendant conspirators' conspiracy described herein, Plaintiffs have suffered injuries which include mental anguish, emotional distress, embarrassment, humiliation, loss of reputation and a decreased credit rating which has, or will, impair Plaintiffs' ability to obtain credit at a more favorable rate than before the decrease in credit rating, the loss or anticipated loss of their Residences and other financial losses according to proof, and Plaintiffs have incurred attorneys' fees and costs in this matter.

219.   Defendant conspirators' actions were wanton, willful and reckless, and justify an award of punitive damages against Defendant conspirators, and each of them.

### NINTH CLAIM FOR RELIEF
**(Intentional Infliction of Emotional Distress)**
**(As to Defendants GE Money, WMC Mortgage Corp., Wells Fargo Bank, N.A., America's Servicing Company, Countrywide Home Loans, Inc., America's Wholesale Lender and MERS)**

220.   Plaintiffs incorporate each and every paragraph of this Complaint as if fully set out in this claim.

221.   Defendants' actions in targeting Plaintiffs for a loan, misrepresenting the terms and conditions of the loan, negotiating the loan, and closing the loan as alleged herein were intentional, reckless, wanton and willful.

222.   Defendants' actions as alleged herein were extreme and outrageous because of the Plaintiffs' vulnerability to the predatory lending practices described herein and because the subject of the loan was Plaintiffs' primary residence, inherent with the characteristics of providing shelter for Plaintiffs and a sense of pride and emotional security.

223.   As a result of Defendants' actions alleged herein, Plaintiffs have suffered financial loss, endured the stress inherent in facing the loss of their Residence, and suffer embarrassment and humiliation that results from Plaintiffs being put in the position of defaulting on the loan.   All of these factors have culminated to invade Plaintiffs' mental and emotional tranquility and to cause Plaintiffs severe emotional distress.

224.   Because of the extreme and outrageous nature of Defendants' actions as alleged herein, and to deter such conduct in the future, Plaintiffs are entitled to an award of punitive damages and such other relief as set forth below.

## TENTH CLAIM FOR RELIEF
### (Injunctive Relief)

**(As to Plaintiffs Robinson against Defendant Wells Fargo, America's Servicing Company, First American Title Insurance Company, and MERS, Inc.)**

225.   Plaintiffs incorporate each and every paragraph of this Complaint as if fully set forth herein.

226.   Neither Defendants America's Servicing Company nor MERS, Inc. nor any purported assignee of MERS, Inc., is the proper beneficiary under the Notes and Deed of Trust, and neither is a proper party to institute a foreclosure action or a trustee's sale.

227.   Furthermore, Defendant First American Title Company failed to properly record its interest with the County Recorder for Pima County prior to noticing two trustee's sales of the Robinson Residence, the second of which was not canceled until this Court entered a temporary restraining order stopping the sale.  A.R.S. § 33-804 mandates that a Notice of Substitution of Trustee be recorded in "each county in which the trust property or some part of the trust property is situated at the time of the substitution." A.R.S. §33-804 (C).  The Notice of Substitution of Trustee appointing First American Title Company was not filed in the Pima County Recorder's office until January 28, 2009, almost a month after the pending Notice of Trustee's Sale was filed on December 31, 2008.   Therefore, it

logically follows that First American Title recorded the impending Notice of Trustee's prematurely, and therefore the Notice of Trustee Sale is ultimately invalid.

228.   Plaintiffs will suffer irreparable harm if Defendants or their assignees are not permanently enjoined from selling Plaintiffs' Residences at a foreclosure or trustee's sale, as Plaintiffs will lose Plaintiffs' financial interest in the Residence, and Plaintiffs will have no adequate remedy at law, because the Residence is unique.

229.   Defendants will not suffer irreparable harm if the foreclosure sale or trustee's sale is enjoined.

230.   Plaintiffs are entitled to a permanent injunction prohibiting Defendants, their agents, employees or servants from selling Plaintiffs' Residence at a foreclosure sale or trustee's sale as described herein.

231.   Plaintiffs have been required to retain counsel in this matter to protect Plaintiffs' rights and have incurred attorneys' fees and costs in this matter.

**(As to Plaintiff Silvas against Defendants Countrywide Home Loans, Inc. and MERS, Inc.)**

232.   Plaintiffs incorporate each and every paragraph of this Complaint as if fully set out in this claim.

233.   The Notice of Trustee's Sale of the Silvas Residence issued by Recontrust Company, Inc. on or about July 23, 2008, referred to MERS, Inc. as the beneficiary.  Upon information and belief, Defendant MERS, Inc. was not the holder of the note executed by Plaintiff Silvas.

234.   Upon information and belief, Defendant MERS, Inc., in improperly causing Recontrust Company to issue the Notice of Trustee's Sale to Plaintiff Silvas, violated 15 U.S.C. 1692(f)(6), which prohibits taking or threatening to take nonjudicial action to effect dispossession of property if there is no present right to possession of the property claimed as collateral through an enforceable security interest.

235.   Defendants Countrywide Home Loans, Inc., its division or subsidiary, America's Wholesale Lender, and MERS, Inc. and each of them, used false, deceptive and misleading representations to Plaintiff Silvas by failing to disclose any transfers in connection with the Note, in violation of 15 U.S.C. 1692(f).

236.   Upon information and belief, Defendants Countrywide Home Loans, Inc., its division or subsidiary, America's Wholesale Lender, and/or MERS, Inc. sent false, deceptive and misleading correspondence and coupons to Plaintiff Silvas which misstated the amount of the payments owed and the monetary amount needed to bring the mortgage current.

237.   Defendant MERS, Inc. caused the Notice of Trustee Sale on the Silvas Residence to be published by recording same with the Santa Cruz County Recorder.  For the reasons stated above, Defendant MERS, Inc. improperly published that Plaintiff's property was in foreclosure and that Defendant was a proper party to initiate foreclosure.

238.   Although the Trustee's Sale of the Silvas Residence has since been canceled, Plaintiff Silvas is still faced with an impending subsequent Notice of Trustee's Sale of her home, which is a clear and present danger of the loss of the Silvas Residence due to the sale of the Residence at a trustee's sale as alleged herein.

239.   Neither Defendant Countrywide Home Loans, Inc. nor MERS, Inc. is the proper beneficiary under the Plaintiff Silvas' Note and Deed of Trust, and neither is a proper party to institute a foreclosure sale or a trustee's sale as to the Silvas Residence.

240.   Plaintiff Silvas will suffer irreparable harm if Defendants Countrywide Home Loans, Inc., its division or subsidiary, America's Wholesale Lender, and/or MERS, Inc. or any assignee are not enjoined from selling Plaintiff's Residence at a foreclosure or trustee's sale, as Plaintiff Silvas will lose Plaintiff's interest in, and possession of, the Residence, which is Plaintiff's primary dwelling and is unique, and Plaintiff Silvas will have no adequate remedy at law.

241.   Defendants Countrywide Home Loans, Inc. and MERS, Inc. have no investment in the Residence, as the Note on the Silvas Residence was transferred as alleged in Count Eight above, and, therefore, Defendants Countrywide and MERS, Inc. will not suffer irreparable harm if the foreclosure sale or trustee's sale is enjoined.

242.   Plaintiff Silvas is entitled to a preliminary and permanent injunction prohibiting Defendants Countrywide, its division or subsidiary, America's Wholesale Lender, and MERS, Inc., their agents, employees or servants from selling Plaintiff's Residence at a foreclosure sale or trustee's sale.

243.   Plaintiff Silvas, and others similarly situated, are faced with the clear and present danger of losing their Residences due to threatened foreclosure action at a trustee's sale as alleged herein.

**(As to Plaintiff Holbert against Defendants Countrywide Home Loans, Inc. and MERS, Inc.)**

244.   Plaintiffs incorporate each and every paragraph of this Complaint as if fully set out in this claim.

245.   Defendant Countrywide Home Loans, Inc., and MERS, Inc. and each of them, made false, deceptive and misleading representations to Plaintiff Holbert by failing to disclose any transfers in connection with the Note, in violation of 15 U.S.C. 1692(f).

246.   Upon information and belief, Defendants Countrywide Home Loans, Inc. and/or MERS, Inc. sent false, deceptive and misleading correspondence and coupons to Plaintiff Holbert that misstated the amount of the payments owed and the monetary amount needed to bring the mortgage current.

247.   Neither Defendant Countrywide Home Loans, Inc. nor MERS, Inc. is the proper beneficiary under the Plaintiff Holbert's Note and Deed of Trust, and neither is a proper party to institute a foreclosure sale or a trustee's sale as to the Holbert Residence.

248.   Plaintiff Holbert will suffer irreparable harm if Defendants Countrywide Home Loans, Inc. and/or MERS, Inc. or any assignee are not enjoined from selling Plaintiff's Residence at a foreclosure or trustee's sale, as Plaintiff Holbert will lose Plaintiff's interest in, and possession of, the Residence, which is Plaintiff's primary dwelling and is unique, and Plaintiff Holbert will have no adequate remedy at law.

249.   Defendants Countrywide Home Loans, Inc. and MERS, Inc. have no investment in the Residence, as the Note on the Holbert Residence was transferred as alleged in Count Eight above, and, therefore, Defendants Countrywide and MERS, Inc. will not suffer irreparable harm if the foreclosure sale or trustee's sale is enjoined.

250.   Plaintiff Holbert is entitled to a preliminary and permanent injunction prohibiting Defendants Countrywide and MERS, Inc., their agents, employees or servants from selling Plaintiff's Residence at a foreclosure sale or trustee's sale.

251.   Plaintiff Holbert, and others similarly situated, are faced with the clear and present danger of losing their Residences due to threatened foreclosure action at a trustee's sale as alleged herein.

### (As to Class Members against Named Defendants)

252.   Upon information and belief, the class of plaintiffs represented by Plaintiffs Robinson, Silvas and Holbert entered into loans whereby one of the named defendants was the lender, and MERS, Inc. was listed as the beneficiary under the Deed of Trust.

253.   Upon information and belief, Defendant MERS, Inc. is or was not the holder of the notes signed by class members, which are notes that were secured by the Deed of Trust listing MERS, Inc. as the beneficiary.

254.   Upon information and belief, Defendant MERS, Inc. is not a proper party to initiate or threaten foreclosure, but Defendant MERS, Inc. has improperly issued or will improperly issue a Notice of Trustee's sale against Plaintiff class members.

255.   The class members will suffer irreparable harm if Defendant MERS, Inc. is not enjoined from selling the class members' property at a foreclosure or trustee's sale, or from assigning its purported beneficial interest in class members' deeds of trust to another party for the purpose of effectuating a trustee's sale, as the class members will lose their interest in and possession of their primary residences, which are the class members'

primary dwellings, and are unique, and the class members will have no adequate remedy at law.

256.   Defendant MERS, Inc. has no investment in the class members' residences, as the notes were improperly transferred as alleged in Count Eight above, and therefore, Defendants will not suffer irreparable harm if the foreclosure sale or trustee's sale is enjoined.

257.   The class members who were issued a Note and Deed of Trust on which MERS, Inc. was listed as the beneficiary are entitled to a temporary restraining order and a preliminary and permanent injunction prohibiting any of the named Defendants from transferring or accepting the transfer of any beneficial interest in, or rights to act as Trustee under any Deed of Trust which identified MERS, Inc. as the "beneficiary" on any residential property located in the State of Arizona.

258.   The class members are entitled to a temporary restraining order and a preliminary and permanent injunction to prohibit any named Defendant from proceeding with any action to foreclose, to sell at a foreclosure sale, or in any other way to interfere with the peaceful use and possession by any class member whose primary residence was the subject of a Deed of Trust which identified MERS, Inc. as the "beneficiary."

259.   The class members are entitled to a temporary restraining order and a preliminary and permanent injunction to prohibit any named Defendant who is a member of MERS, Inc. from transferring any interest in any residential property in Arizona in which Defendants acquired and/or hold title in the name of MERS, Inc. or a MERS, Inc.

member, and in which MERS, Inc. had purported to transfer beneficial interest under a Deed of Trust prior to a foreclosure or trustee's sale.

260.   Plaintiffs have been required to retain counsel in this matter to protect Plaintiffs' rights and have incurred attorneys' fees and costs in this matter.

**ELEVENTH CLAIM FOR RELIEF**
**(Declaratory Relief)**

261.   Plaintiffs incorporate each and every paragraph of this Complaint as if fully set out in this claim.

262.   As alleged in Plaintiffs' claims regarding the Defendants' violations of the Truth In Lending Act, the Real Estate Settlement Procedures Act, the Fair Housing Act, the Home Ownership and Equity Protection Act, the Arizona Consumer Fraud Act, conspiracy to commit fraud and conversion, and conspiracy to commit from related to the MERS system, Defendants have violated Plaintiffs' rights under federal and state law.

263.   Plaintiffs seek a declaratory judgment against Defendants stating that Defendants violated Plaintiffs' rights under the Truth in Lending Act, the Real Estate Settlement Procedures Act, the Home Ownership and Equity Protection Act, the Fair Housing Act, the Arizona Consumer Fraud Act, and by engaging in the conspiracies to commit fraud and conversion and related to the MERS system as appropriate to each Plaintiff.

264.   Plaintiffs have been required to retain counsel in this matter to protect Plaintiffs' rights and have incurred attorneys' fees and costs in this matter.

**CLASS ACTION ALLEGATIONS AND**

**REQUEST FOR CLASS CERTIFICATION**

265.    Plaintiffs incorporate each and every paragraph of this Complaint as if fully set out in this claim.

**Class Definition**

266.    Plaintiffs, pursuant to Fed. R. Civ. P. 23(a), (b)(2-3), bring this action on behalf of themselves and a similarly situated class of individuals under the provisions of federal and state laws regarding plaintiff class actions.  The class is composed of Plaintiffs and all other individuals in Arizona and the United States whose residential real estate loans were originated, funded, sold, transferred, insured or guaranteed by Defendants between 2005 and present, and who were damaged or face risk of damage by the origination, servicing, sale, transfer, foreclosure, and/or acquisition of such loans.  Excluded from the class are Defendants, including any parent, subsidiary, affiliate or controlled person of Defendants and their officers, directors, agents or employees, any judge or judicial officer assigned to this matter, and members of the immediate families of any excluded persons.

**Numerosity**

267.    Upon information and belief, the class comprises not less than 125 individual members, and the membership in the class is so numerous that joinder of all members is impracticable.  The members of the class can be identified and located using information contained in the Defendants' mortgage lending records.

**Common Questions of Law and/or Fact**

268.    There are common questions of law and/or fact common to the class, including whether Defendant GE Money through its division or subsidiary WMC

Mortgage Corp. and and Countrywide through its division or subsidiary America's Wholesale Lender violated the Truth in Lending Act, Real Estate Settlement and Procedures Act, the Home Ownership and Equity Protection Act, the Federal Fair Housing Act, and the Fair Debt Collection Practices Act, as alleged herein, and whether any such violations constituted a conspiracy to commit fraud or conversion and/or whether Defendants' conduct constitutes intentional infliction of emotional distress on the class members. Also common to the class is the issue of whether the named Defendants acted as conspirators in committing fraud in the creation and origination of the MERS system as alleged herein.

**Typicality**

269.   The damages and/or losses to Plaintiffs were caused by Defendants in the same course of conduct that gives rise to the claims of the other members of the class.

270.   Plaintiffs' claims are typical of those of the members of the class. Plaintiffs and the class members were subjected to the same kind of unlawful conduct and the claims of Plaintiffs and the class members are based on the same legal theories.

**Fair and Adequate Representation of Class**

271.   Plaintiffs will fairly and adequately protect the interests of the class Plaintiffs represent. Plaintiffs' interests do not conflict with the interests of the class, and Plaintiffs intend on prosecuting this action vigorously.

272.   Plaintiffs have retained experienced counsel qualified in class action litigation, and counsel is competent to assert the interests of the class.

**Rule 23(b) Requirements**

273.   The unlawful acts of Defendants, as alleged herein, constitute a course of conduct common to Plaintiffs and each class member.  Prosecution of separate actions by individual class members would create a risk of inconsistent or varying adjudications, which would establish incompatible standards of conduct for Defendants and/or substantially impair or impede the ability of the individual class members to protect their interests.

274.   Injunctive and/or declaratory relief to the class is appropriate because, upon information and belief, Defendants, and each of them, have acted or refused to act on grounds generally applicable to the class.

275.   Questions of law and/or fact common to the class members, including the issues identified above, predominate over questions affecting only individual class members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy.  Class action treatment will allow a large number of similarly situated individuals to simultaneously pursue their common claims in a single forum in an efficient manner, without unnecessary duplication of effort and expense that would be required if numerous individual actions were pursued.

**WHEREFORE**, Plaintiffs pray this court enter an order providing relief as follows:

1.   For award of damages against Defendants and each of them on Plaintiffs' claims as applicable under federal law as alleged above in an amount to be shown at trial;

2.   For an award of damages against Defendants, and each of them, on the Plaintiffs' state law claims, whether general, special or punitive as alleged above, in an amount to be shown at trial;

3.      For an award of attorneys' fees and costs as provided by law;

4.      For a temporary restraining order and preliminary and permanent injunction prohibiting Defendants, their agents, servants and employees as specifically alleged above from selling Plaintiffs' property at foreclosure and from proceeding with any foreclosure or collection action against the Plaintiffs;

5.      For a temporary restraining order and preliminary and permanent injunction prohibiting Defendants, their agents, servants and employees as specifically alleged above from transferring or accepting the transfer of any beneficial interest in, or rights to act as Trustee under, any Deed of Trust which identified MERS, Inc. as the "beneficiary" on any residential property located within the State of Arizona;

6.      For a temporary restraining order and preliminary and permanent injunction prohibiting Defendants, their agents, servants and employees as specifically alleged above from proceeding with any action to foreclose, to sell at a foreclosure or trustee's sale, or in any other way to interfere with class members' peaceful use and possession of any residential property located in Arizona that was the subject of a Deed of Trust which identified MERS, Inc. as the "beneficiary;"

7.      For a temporary restraining order and preliminary and permanent injunction prohibiting Defendants, their agents, servants and employees as specifically alleged above from transferring any interest in any residential property in Arizona in which Defendants acquired and/or hold title in the name of MERS, Inc. or a MERS, Inc. member, and in which MERS, Inc. had purported to transfer beneficial interest under a Deed of Trust prior to a foreclosure or trustee's sale;

8.      For a declaratory judgment holding that Plaintiffs' rights were violated as alleged above;

9.      That Plaintiffs have and recover from the Defendants pre-judgment interest as may be determined by statute and rule;

10.     That this action be certified as a Plaintiffs' class action: and

11.     Pursuant to Federal Rules of Civil Procedure, Rule 38, Plaintiffs demand a trial by jury on all issues of fact in this action; and

12.     That this court grant such other and further relief as it deems just and proper.

**DATED** this 19th day of June, 2009.

**KOELLER, NEBEKER, CARLSON & HALUCK, LLP**


By   William A. Nebeker
       William A. Nebeker, Esq.
       Rosary A. Hernandez, Esq.
       Gregory E. Williams, Esq.
       Valerie R. Edwards, Esq.
       Lisa I. Streu, Esq.
       *Attorneys for Plaintiff*

1

2

### <u>DEMAND FOR JURY TRIAL</u>

3

Pursuant to *Fed. R. Civ. P.* 38(b), Plaintiffs hereby demand a trial by jury to the

4

fullest extent permitted by law.

5

**DATED** this 19th day of June, 2009.

6

7

**KOELLER, NEBEKER, CARLSON & HALUCK, LLP**

8

9

By___William A. Nebeker_____

10

William A. Nebeker, Esq.

11

Rosary A. Hernandez, Esq.
Gregory E. Williams, Esq.

12

Valerie R. Edwards, Esq.
Lisa I. Streu, Esq.

13

*Attorneys for Plaintiff*

14

15

16

17

18

19

20

21

22

23

24

25

1

## <u>CERTIFICATE OF SERVICE</u>

2

3

I hereby certify that on June 19, 2009, I electronically transmitted the attached document to the Clerk's Office using the ECF system for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

4

5

| | |
|---|---|
| Janet Weinstein<br>Patrick Klein<br>Fennemore Craig, PC<br>3003 N. Central Avenue, Suite 2600<br>Phoenix, AZ  85012-2913<br>jweinstein@fclaw.com<br>pklein@fclaw.com<br>*Attorneys for AIG United Guaranty Corporation* | James A. Ryan<br>Lauren Elliott Stine<br>Quarles & Brady, LLP<br>Two N. Central Avenue<br>Renaissance One<br>Phoenix, AZ 85004-2391<br>James.ryan@quarles.com<br>Lauren.stine@quarles.com<br>*Attorneys for CitiMortgage, Inc.* |
| Lucia Nale<br>Thomas V. Panoff<br>Mayer Brown, LLP<br>71 South Wacker Drive<br>Chicago, IL  60606<br>lnale@mayerbrown.com<br>tpanoff@mayerbrown.com<br>*Attorneys for CitiMortgage, Inc.* | Joseph F. Yenouskas<br>Thomas M. Procter<br>Goodwin Hefferon, LLP<br>901 New York Avenue, N.W.<br>Washington, D.C.  20001<br>jyenouskas@goodwinprocter.com<br>thefferon@goodwinprocter.com<br>*Attorneys for Countrywide Home Loans, Inc., Wells Fargo Bank, N.A. and Bank of America* |
| U. Gwyn Williams<br>Goodwin Procter, LLP<br>Exchange Place<br>Boston, MA  02109<br>gwilliams@goodwinprocter.com<br>*Attorneys for Countrywide Home Loans, Inc., Wells Fargo Bank, N.A. and Bank of America* | Robert W. Shely<br>Gregory B. Iannelli<br>Bryan Cave, LLP<br>Two North Central Avenue, Suite 2200<br>Phoenix, AZ  85004-4406<br>rwshely@bryancave.com<br>Gregory.iannelli@bryancave.com<br>*Attorneys for Countrywide Home Loans, Inc.* |

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | |
|---|---|
| Mark S. Landman<br>Landman Corsi Ballaine & Ford, PC<br>120 Broadway, Suite 27th Floor<br>New York, NY 10271<br>mlandman@lcbf.com<br>*Attorneys for Federal Home Loan Mortgage Corporation* | Gregory W. Falls<br>Sherman & Howard, LLC<br>2800 N. Central Avenue<br>Phoenix, AZ  85004-4429<br>gfalls@shermandhoward.com<br>*Attorneys for Federal Home Loan Mortgage Corporation* |
| Joanne Lee<br>William McKenna<br>Jill Murch<br>Foley & Lardner, LLP<br>321 N. Clark Street, Suite 2800<br>Chicago, IL  60654<br>jlee@foley.com<br>wmckenna@foley.com<br>jmurch@foley.com<br>*Attorneys for Federal National Mortgage Association (Fannie Mae)* | Charles A. Newman<br>Sonnenschein Nath & Rosenthal, LLP<br>One Metropolitan Square<br>211 N. Broadway, Suite 3000<br>St. Louis, MO  63102-2747<br>cnewman@sonnenschein.com<br>*Attorneys for First American Title Insurance Company* |
| Joshua S. Akbar<br>Sonnenschein Nath & Rosenthal, LLP<br>2398 E. Camelback Road, Suite 1100<br>Phoenix, AZ  85016-9016<br>jakbar@sonnenschein.com<br>*Attorneys for First American Title Insurance Company* | Joel D. Siegel<br>Sonnenchein Nath & Rosenthal, LLP<br>601 S. Figuero Street, Suite 2500<br>Los Angeles, CA  90017-5704<br>jsiegel@sonnenchein.com<br>*Attorneys for First American Title Insurance Company* |
| Kelly MacHenry<br>Snell & Wilmer, LLP<br>One Arizona Center<br>400 E. Van Buren<br>Phoenix, AZ  85004-2202<br>KmacHenry@swlaw.com<br>*Attorneys for GE Money Bank and WMC Mortgage Corp.* | Craig W. Phillips<br>Robert G. Schaffer<br>Lewis and Roca, LLP<br>40 N. Central Avenue<br>Phoenix, AZ 85004-4429<br>bschaffer@LRLaw.com<br>*Attorneys for GMAC Mortgage, LLC* |
| Henry F. Reichner | Gregory J. Marshall |

| | |
|---|---|
| Reed Smith, LLP<br>2500 One Liberty Place<br>1650 Market Street<br>Philadelphia, PA  19103<br>hreichner@reedsmith.com<br> *Attorneys for GMAC Mortgage, LLC* | James R. Condo<br>Joseph E. Anthony<br>Snell & Wilmer, LLP<br>One Arizona Center<br>400 East Van Buren Street<br>Phoenix, AZ  85004-2202<br>gmarshall@swlaw.com<br>janthony@swlaw.com<br>*Attorneys for HSBC Mortgage Corporation, U.S.A., Federal National Mortgage Association* |
| Douglas C. Erickson<br>Jennifer A. Sparks<br>Maynard Cronin Erickson Curran & Sparks, PLC<br>3200 N. Central Avenue, Suite 1800<br>Phoenix, AZ 85012<br>derickson@mmcec.com<br>Jsparks@mmcec.com<br>*Attorneys for J.P. Morgan Chase Bank, N.A.* | LeAnn Pedersen Pope<br>Danielle J. Szukala<br>Burke, Warren, MacKay & Serritella, PC<br>330 N. Wabash Avenue, Suite 2200<br>Chicago, IL  60611<br>lpope@burkelaw.com<br>dszukala@burkelaw.com<br>*Attorneys for J.P. Morgan Chase Bank, N.A.* |
| Robert M. Brochin<br>Morgan, Lewis & Bockius, LLP<br>Wachovia Financial Center<br>200 S. Biscayne Boulevard, Suite 5300<br>Miami, FL  33131<br>rbrochin@morganlewis.com<br>*Attorneys for MERSCORP, Inc. and Mortgage Electronic Registration Systems, Inc.* | James R. Condo<br>Gregory J. Marshall<br>Snell & Wilmer, LLP<br>One Arizona Center<br>400 E. Van Buren Street<br>Phoenix, AZ  85004-2202<br>jcondo@swlaw.com<br>gmarshall@swlaw.com<br>*Attorneys for MERSCORP, Inc. and Mortgage Electronic Registration Systems, Inc.* |
| Barbara J. Dawson<br>Snell & Wilmer, LLP | Brian Schulman<br>Ballard Spahr Andrews & Ingersoll |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

One Arizona Center
400 E. Van Buren
Phoenix, AZ  85004-2202
bdawson@swlaw.com
*Attorneys for Wells Fargo Bank, N.A.*

3300 N. Central Avenue, Suite 1800
Phoenix, AZ  85012-2518
schulmanb@ballardspahr.com
*Attorneys for National City Mortgage*

*/s/ Cheryl A. Scates*